DAMIEN M. SCHIFF*, Cal. Bar No. 235101
E-mail: dms@pacificlegal.org
ANTHONY L. FRANÇOIS*, Cal. Bar No. 184100
E-mail: alf@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

JONATHAN WOOD, D.C. Bar No. 1045015
E-mail: jw@pacificlegal.org
Pacific Legal Foundation
3033 Wilson Blvd., Suite 700
Arlington, Virginia 22201
Telephone: (202) 888-6881

*Pro Hac Vice pending

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE, ACCURACY & RELIABILITY<br>259 I Street<br>Los Banos, California 93635<br><br>COALITION OF LABOR, AGRICULTURE & BUSINESS OF SANTA BARBARA COUNTY<br>P.O. Box 7523<br>Santa Maria, California 93456<br><br>PROPERTY OWNERS ASSOCIATION OF RIVERSIDE COUNTY<br>6407 Reflection Drive, Suite 205<br>San Diego, California 92124 | No. _____ |

1

CALIFORNIA BUILDING INDUSTRY   )
ASSOCIATION   )
1215 K Street, Suite 1200   )
Sacramento, California 95814   )
  )
NATIONAL ASSOCIATION OF HOME   )
BUILDERS OF THE UNITED STATES   )
1201 15th Street, NW   )
Washington, DC  20005   )
  )
BUILDING INDUSTRY LEGAL DEFENSE   )
FOUNDATION   )
24 Executive Park, Suite 100   )
Irvine, California 92614   )
        Plaintiffs,   )
  )
   v.   )
  )
UNITED STATES DEPARTMENT OF   )
INTERIOR   )
1849 C Street N.W.   )
Washington, DC  20240   )
  )
RYAN ZINKE, in his official capacity as   )
Secretary of the Department of Interior   )
1849 C Street N.W.   )
Washington, DC  20240   )
  )
UNITED STATES FISH AND WILDLIFE   )
SERVICE   )
1849 C Street N.W., Room 3331   )
Washington, DC  20240   )
  )
GREG SHEEHAN, in his official capacity as   )
the Principal Deputy Director and Acting   )
Director of the United States Fish and   )
Wildlife Service   )
1849 C Street N.W., Room 3331   )
Washington, DC  20240   )
        Defendants.   )
_____ )

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

2

Complaint for Decl. & Inj. Relief

1.     Plaintiffs Center for Environmental Science, Accuracy, and Reliability, *et al.*, seek declaratory and injunctive relief against Defendants United States Department of Interior, Secretary of the Interior Ryan Zinke, United States Fish and Wildlife Service, and Acting Director Greg Sheehan (collectively "the Service"), for violating the Endangered Species Act.  In 2014, several of the Plaintiffs petitioned the Service to delist the coastal California gnatcatcher under the Endangered Species Act, on the grounds that the best scientific and commercial data show the gnatcatcher is not a subspecies and therefore ineligible for listing under the Act.  The Service denied the petition by determining that the coastal California gnatcatcher is a subspecies, despite conceding that it uses no definition of "subspecies" or any criteria for determining that any given population or group of populations is a subspecies.

2.     The Service's denial of the delisting petition for the coastal California gnatcatcher is arbitrary and capricious or otherwise not in accordance with law because: (i) the Service upheld the gnatcatcher's designation as a "subspecies" without articulating any definition of "subspecies"; and (ii) the Service failed to provide notice to the public or an opportunity to participate in and comment upon a meeting of outside scientific experts, the recommendations from which were instrumental to the Service's petition denial.  Therefore, the final rule denying the delisting petition violates the Endangered Species Act (ESA), 16 U.S.C. §§ 1531-1544, the Administrative Procedure Act (APA), 5 U.S.C. §§ 701-706, and the Federal Advisory Committee Act, 5 U.S.C. App. 2, §§ 1-16.  The rule should be vacated and the matter remanded to the Service.

## JURISDICTION AND VENUE

3.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction); § 2201 (authorizing declaratory relief); § 2202 (authorizing injunctive relief); 16 U.S.C. § 1540(c) and (g) (actions arising under the ESA); and 5 U.S.C. § 702 (providing for judicial review of agency action under the APA).

4.    On July 17, 2017, more than 60 days before the filing of this complaint, Plaintiffs provided Defendants Zinke and Sheehan with written notice of the violations that are the subject of this lawsuit, in accordance with 16 U.S.C. § 1540(g)(2)(C).  The notice is attached as Exhibit 1 and is incorporated herein by reference.  None of the Defendants has responded to this notice or taken any action to withdraw the final rule at issue here or otherwise to remedy the violations of law identified therein.

5.    Venue in the District of Columbia is proper under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e), because at least one Defendant is located in the District of Columbia.

## DESCRIPTION OF PARTIES AND STANDING ALLEGATIONS

### Plaintiffs

6.    Plaintiff Center for Environmental Science, Accuracy & Reliability (CESAR) is a California nonprofit corporation the primary purpose of which is to bring scientific rigor to regulatory decisions undertaken pursuant to environmental statutes, and to ensure consistent application of these statutes throughout all

industries and sectors.  CESAR believes that these activities will generate additional support for environmental statutes, because the results of and bases for regulatory actions will be transparent and supported by good science.  CESAR was a petitioner in the 2014 petition to delist the gnatcatcher.  Among CESAR's members is Robert Zink, an avian evolutionary biologist at the University of Nebraska.  Dr. Zink is the lead author of two genetic studies on the gnatcatcher.  His most recent study formed the basis for the delisting petition, the denial of which is challenged by this action. Dr. Zink has an ongoing scientific and academic interest in the conservation of the gnatcatcher.

7.     Plaintiff Coalition of Labor, Agriculture & Business of Santa Barbara County (COLAB) is a nonprofit organization comprised of 1,000 members, including all the leading farming and ranching families in the central coast region of California. Founded in 1991, COLAB seeks to preserve Santa Barbara County's heritage and economy, which are primarily dependent on family-owned businesses with a heavy emphasis on farming and ranching operations.  COLAB cares about the Endangered Species Act's frequent maladministration, including the continued erroneous listing of the gnatcatcher, because Santa Barbara County has more species listed than any other county in the continental United States.  COLAB was a petitioner in 2014 for the delisting of the gnatcatcher.

8.     Plaintiff Property Owners Association of Riverside County (POARC) is a nonprofit, public policy research, educational, and advocacy organization.  Founded in 1983, POARC seeks to promote free enterprise and economic growth, as well as to

serve as an advocate for property owners to ensure that the interests and property rights of landowners will be protected in the formation and implementation of public policies.   POARC's membership consists of property owners, farmers, ranchers, developers, homebuilders, architects, engineers, contractors, attorneys, brokers, real estate agents, property managers, businesses, and others whose interests are affected by land-use regulation.   POARC was a petitioner in 2014 for the delisting of the gnatcatcher.   POARC's membership includes landowners in Riverside County whose properties are located within the gnatcatcher's critical habitat and subject to its regulatory restrictions.   The critical habitat designation hinders the ability of these property owners to use their property as well as decreases the value of their property.

9.   Plaintiff California Building Industry Association (CBIA) represents approximately 3,000 member-companies, including homebuilders, trade contractors, architects, engineers, designers, suppliers, and other industry professionals.   CBIA members design and construct California's housing.   CBIA's purpose is to advocate on behalf of its members' interests, including representation in regulatory matters and litigation affecting the ability of its members to provide housing, office, industrial, and commercial facilities for California residents.   Since 1990, CBIA members have been actively involved in all regulatory and planning issues concerning the gnatcatcher.   They have committed hundreds of millions of dollars and tens of thousands of acres of land to the bird's conservation in the various habitat conservation plans and natural community conservation plans in Southern California.   CBIA was a petitioner to delist the gnatcatcher in 2014.

10.   Plaintiff National Association of Home Builders of the United States (NAHB) is a national trade association consisting of more than 140,000 builder and associate members organized into more than 700 affiliated state and local associations in all 50 states, the District of Columbia, and Puerto Rico.  Its members include individuals and firms that construct single-family homes, apartments, condominiums, and commercial and industrial projects, as well as land developers and remodelers. NAHB's members employ between six million and eight million workers.  More than 80% of its members are classified as "small businesses" and meet the federal definition of a "small entity," as defined by the federal Small Business Administration.  Although the ultimate goal of the Endangered Species Act is species recovery, this goal in practice too often takes a backseat to an impermissible aim— land-use regulation.  Homebuilders and other private property owners seeking to comply with the Act frequently encounter regulations that do not contain sufficient scientific criteria for determining whether species are truly endangered.  These regulations also result in improper and unreasonable habitat conservation and recovery plans for listed species.  Interagency jurisdictional disagreements and inconsistent interpretations of regulations are further sources of unnecessary delay, which in turn increases the cost of housing and frustrates community building in many areas of the country where listed species are found.  Some of these ills would be moderated through the gnatcatcher's delisting.  NAHB was a petitioner for the delisting of the gnatcatcher in 2014.

11.   Plaintiff Building Industry Legal Defense Foundation (BILD) is a nonprofit mutual benefit corporation and a wholly controlled affiliate of the Building Industry Association of Southern California, Inc. (BIASC).  BIASC represents approximately 1,200-member companies across Southern California that are active in all aspects of the building industry, including: land developers; builders of housing, commercial, and infrastructure product; and related entities including architects, engineers, planners, contractors, suppliers, and property owners.  The purposes of BILD are, in part, to initiate or support litigation or agency action designed to improve the business climate for the building industry and to monitor and involve itself in government regulation critical to the industry.  BILD's interest in seeking delisting of the gnatcatcher stems from its interest in promoting the building industry, especially in areas of Southern California, where the bird species can be found. Regulatory restrictions related to the gnatcatcher, including large swaths of land marked as critical habitat, have long hampered the building industry.   BILD Foundation seeks to ensure that unnecessary regulation will be lifted so that economic progress can be made and the building industry can thrive.

## Defendants

12.   Defendant Department of Interior is an agency of the United States. Congress has charged the Department with administering the ESA for nonmarine species.

Complaint for Decl. & Inj. Relief

13. Defendant Ryan Zinke is Secretary of the Department of Interior.  He oversees the Department's administration of the ESA and is sued in his official capacity only.

14. Defendant United States Fish and Wildlife Service is an agency of the Department of Interior.  The Service has been delegated responsibility by the Secretary of the Department of Interior for the day-to-day administration of the ESA, including the listing of threatened and endangered nonmarine species.

15. Defendant Greg Sheehan is the Principal Deputy Director and Acting Director of the United States Fish and Wildlife Service.  He oversees the Service's administration of the ESA and is sued in his official capacity only.

16. All of these Defendants are responsible for the violations alleged in this complaint.

## LEGAL FRAMEWORK

### Listing of Threatened or Endangered Species

17. For protection under the ESA, a "species" must be determined to be "endangered" or "threatened."  *See* 16 U.S.C. § 1533(a).  A "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." *Id*. § 1532(16).

18. The ESA does not define the term "subspecies."  *See id*. § 1532.

19. A species or subspecies is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range." *Id*. § 1532(6).  A species or

subspecies is "threatened" if it "is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id*. § 1532(20).

20.    To be listed under the ESA, a bird must be either a threatened or endangered species, subspecies, or distinct population segment.    The coastal California gnatcatcher is listed as a threatened subspecies. *See* 50 C.F.R. § 17.41(b).

21.    The ESA forbids the unpermitted "take" of any endangered species of fish or wildlife. *See id.* § 1538(a)(1)(B).   The term "take" means to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." *Id*. § 1532(19).   The term "harm" includes "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding, or sheltering."   50 C.F.R. § 17.3.

22.    By administrative rule, the statutory prohibition on take has been extended to all threatened fish and wildlife. *See id.* § 17.31(a).

23.    Generally, concurrent with a species' listing, the Service must designate "critical habitat."   16 U.S.C. § 1533(a)(3).   Such habitat comprises those occupied areas containing the physical or biological features essential to the species' conservation, or any unoccupied area that itself is essential to the species' conservation. *See id*. § 1532(5).   Critical habitat designations negatively affect property owners by increasing the burdens of federal permitting, reducing the value of designated property, and increasing potential take liability for landowners.

24.    The APA authorizes interested parties to petition for the enactment or repeal of any administrative rule.  5 U.S.C. § 553(e).  The ESA requires the Service, to the maximum extent practicable, within 90 days of the receipt of such a petition seeking the listing or delisting of a species, to determine whether the petitioned action may be warranted.  *See* 16 U.S.C. § 1533(b)(3)(A).  Within one year of the petition's receipt, the Service must make a final determination as to whether the petitioned action is warranted.  *Id*. § 1533(b)(3)(B).  If the Service so determines, it must then proceed with rule-making.  *See id*. § 1533(b)(5).

## The Use of Outside Panels and Taskforces

## To Inform Agency Decision-Making

25.    Under the Federal Advisory Committee Act, "the public should be kept informed with respect to the number, purpose, membership, activities, and cost of advisory committees."  5 U.S.C. App. 2, § 2(b)(5).  A group is an "advisory committee" subject to the Act when it is established or utilized to render advice or recommendations on issues or policies within the scope of an agency's official responsibilities.  *See id*. § 3(2).

26.    Advisory committees must provide notice of their meetings in the Federal Register, and give the public the opportunity to attend meetings and to submit testimony.  *Id*. § 10(a)(1)-(3).

27.    "Each advisory committee meeting shall be open to the public" unless there are other extenuating circumstances.  *See id*. § 10(a)(1)-(2).

28.   Any interested party "shall be permitted to attend, appear before, or file statements with any advisory committee, subject to such reasonable rules or regulations as the [General Services] Administrator may prescribe." *Id.* § 10(a)(3).

## FACTUAL ALLEGATIONS

29.   In 1993, the Service listed the coastal California gnatcatcher as a threatened subspecies.  58 Fed. Reg. 16,742 (Mar. 30, 1993).

30.   If the coastal California gnatcatcher is not a subspecies, then the bird is a member of the species *Polioptila californica*, a species with numerous members that ranges from Ventura County in southern California to the southern tip of Baja California, Mexico.  *Polioptila californica* is not threatened or endangered, and meets none of the criteria for listing under either status.

31.   Shortly after the listing of the gnatcatcher, a coalition of homebuilders successfully challenged the listing on the ground that the Service had failed to make publicly available the data underlying the key study supporting the agency's determination that the gnatcatcher is a valid subspecies. *Endangered Species Comm. v. Babbitt*, 852 F. Supp. 32 (D.D.C. 1994).  On remand, however, the Service reaffirmed its view that the California coastal form or population of the gnatcatcher is a subspecies based upon morphological data[1], 60 Fed. Reg. 15,693 (Mar. 27, 1995), despite the fact that the scientist who provided the underlying data confessed "serious doubts" about the accuracy of the data.

---

[1] Morphological data refers to the size, shape, and structure of an organism or one of its parts.

Complaint for Decl. & Inj. Relief

32.   In 2010, a coalition of interested parties—including most of the Plaintiffs—petitioned the Service to delist the gnatcatcher based in part on a mitochondrial DNA study produced by a team of researchers headed by Dr. Zink.  The petition, as well as the study on which it was based, showed that individually distinct gnatcatcher mtDNA sequences, or haplotypes, did not form exclusive clusters that conformed to recognized subspecies.  Thus, no meaningful mtDNA distinction existed between the southern California populations of the gnatcatcher, taxonomically referred to as *Polioptila californica*, and the flourishing *Polioptila californica* populations (represented by two different putative subspecies) found south of the U.S.-Mexico border.

33.   In 2011, the Service denied that petition.  76 Fed. Reg. 66,255 (Oct. 26, 2011).  The Service asserted that the gnatcatcher's subspecies status could not be disproved solely on the basis of mtDNA analysis.  *See id.* at 66,258.  The Service proposed that further research might support delisting, and strongly suggested that a nuclear DNA analysis would be required to disprove the gnatcatcher's subspecies status.  *See id.*

34.   In 2013, following the Service's suggestion, Dr. Zink's research team published a new nuclear DNA analysis, confirming again that the coastal California gnatcatcher is not a subspecies.  This study also showed that the gnatcatcher does not exhibit ecological distinctiveness.

35.   In 2014, the same coalition submitted another delisting petition, contending that the new nuclear DNA study constituted the best available data on the gnatcatcher's taxonomy.  Initially, the Service made a positive determination, finding

that the petition presented substantial information indicating that delisting of the gnatcatcher may be warranted because the bird did not constitute a subspecies. *See* 79 Fed. Reg. 78,775 (Dec. 31, 2014). However, in August, 2016, the Service denied the delisting petition, determining that the coastal California gnatcatcher is a subspecies and should remain listed. 81 Fed. Reg. 59,952 (Aug. 31, 2016).

36.   Addressing whether the gnatcatcher is a subspecies, the Service conceded that "there are no universally agreed-upon criteria for delineating, defining, or diagnosing subspecies boundaries," and that "there is no consensus in the literature for defining subspecies criteria for avian taxa." 81 Fed. Reg. at 59,958. The Service stated that "[e]ach possible subspecies has been subject to unique evolutionary forces," and thus, "the methods for detecting each [subspecies] will be different." *Id.* at 59,959.

37.   The Service has not promulgated a rule defining the term "subspecies."

38.   The Service has promulgated other rules for defining important ESA terms. *See* 61 Fed. Reg. 4722 (Feb. 7, 1996). In 1996, the Service stated that "it is important that the term 'distinct population segment' be interpreted in a clear and consistent fashion" because "available scientific information provides little specific enlightenment in interpreting the phrase." *Id.* at 4722.

39.   Like the term "distinct population segment," there is little scientific information available to interpret the term "subspecies," even among taxonomists. *See* Holly Doremus, *Listing Decisions Under the Endangered Species Act:  Why Better Science Isn't Always Better Policy*, 75 Wash. U. L.Q. 1029, 1100-01 (1997).

40.   In the final rule denying the Petitioners' 2014 delisting petition, the Service heavily relied on a report produced by a "workshop" of outside avian experts.  At the request of the Service, Amec Foster Wheeler Infrastructure and Environment, Inc., provided a panel of scientists and a facilitator for the "workshop" to review the information put forth in the Petition to delist the gnatcatcher.

41.   The panelists met in secret, discussed some of the various information regarding the gnatcatcher's listing status, and issued a report detailing their recommendation to the Service.  *See* U.S. Fish and Wildlife Service, California Gnatcatcher Facilitated Science Panel Workshop 2-4 (Nov. 9, 2015).  The panelists were instructed to accept previous morphological studies as accurate.  *Id.*  This report played a critical role in the Service's decision to maintain the gnatcatcher's listing.  *See* 81 Fed. Reg. at 59,956-62.  However, the public was given no notice or opportunity to attend this workshop, much less to participate in it, or comment on its report.

**INJUNCTIVE AND DECLARATORY RELIEF ALLEGATIONS**

42.   Plaintiffs hereby reallege and incorporate by reference the allegations contained in Paragraphs 1 through 41 as though fully set forth herein.

43.   CESAR's member, Dr. Zink, has a professional interest in the taxonomic decision-making process, especially in regards to subspecies classification.  Dr. Zink has published numerous studies examining the subspecies classification of a variety of species, including the gnatcatcher.  Dr. Zink has a strong professional interest in the Service's resolution of the gnatcatcher's disputed taxonomy.  A decision requiring the Service to articulate a clear and consistent standard for subspecies classifications

would vindicate that interest by, among other things, providing guidance for future research projects. Such a decision also would further CESAR's organizational interest in bringing fairness and scientific rigor to regulatory decision-making.

44. Other Plaintiffs have a significant interest based on their members' land ownership. For example, POARC has several members who own property affected by critical habitat designations for the gnatcatcher. Critical habitat designations negatively affect property owners by increasing the burdens of federal permitting, reducing the value of designated property, and creating potential take liability for landowners. The Service itself has estimated that the economic impact for the gnatcatcher's critical habitat designation will be nearly $1 billion through 2025. *See* U.S. Fish & Wildlife Serv., *Economic Analysis of Critical Habitat Designation for the California Gnatcatcher* 13 (Feb. 24, 2004); U.S. Fish & Wildlife Serv., *Report Addendum: Economic Analysis of Critical Habitat Designation for the California Gnatcatcher* 4 (Sept. 14, 2007). A delisting of the gnatcatcher would result in the rescission of the critical habitat designation, which in turn would ease the economic and other land-use-related injuries suffered by POARC's gnatcatcher-habitat-affected members.

45. If an injunction does not issue remanding the Service's petition denial, Plaintiffs will be left with no legally cognizable subspecies standard to apply to future petitions under the ESA.

46. Plaintiffs have no plain, speedy, and adequate remedy at law for these injuries. Monetary damages in this case are not available.

16

47.   If not enjoined by this Court, Defendants will continue to make taxonomic decisions according to unstated or amorphous standards to suit their own objectives in derogation of Plaintiffs' rights and interests.

48.   An actual and substantial controversy exists between Plaintiffs and Defendants over Defendants' duty to comply with the ESA, the Federal Advisory Committee Act, and the APA in ruling on Plaintiffs' delisting petition.

49.   This case is currently justiciable because Defendants' failure to comply with these laws is the direct result of final agency action that has caused and will continue to cause immediate and concrete injury to Plaintiff associations and their members. Plaintiffs have a keen interest in knowing whether the denial of their delisting petition is legal.

50.   Therefore, injunctive and declaratory relief is appropriate to resolve this controversy.

## CLAIMS FOR RELIEF

### First Claim for Relief
### Failure To Articulate "Subspecies" Standard
### (Violation of the ESA, 16 U.S.C. § 1533(b)(3)(B))

51.   Plaintiffs incorporate herein by this reference all the allegations set forth in Paragraphs 1 through 50.

52.   An agency's articulation of a standard to guide its decision-making is essential to reasoned administrative decision-making.  This rule derives from the requirement that an agency identify a rational connection between the facts found

and the decision made.  *See Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

53.   The ESA authorizes the Service to list "subspecies."  *See* 16 U.S.C. § 1532(16).  However, the statute does not define the term, and the term does not have a commonly accepted meaning among taxonomists.  Thus, for the Service to determine whether to list or to delist a "subspecies," it must itself decide upon a standard or definition for the term.

54.   The Service has not adopted a generally applicable definition of "subspecies."

55.   In denying Plaintiffs' petition to delist the gnatcatcher, the Service identified what it considers to be the relevant types of data and methods for making a taxonomic determination.  But the agency did not articulate a standard or definition for what constitutes a subspecies.  Necessarily, then, the Service could not and did not explain why the morphological, genetic, or other data before the agency support a conclusion that the coastal California gnatcatcher is a subspecies.

56.   This failure to explain renders the Service's decision arbitrary and capricious, for two reasons.  First, a certain degree of statistically significant difference can be detected between nearly any randomly divided populations within a species.  Hence, without a standard to qualify the taxonomic significance of such distinctions, the Service illegally reserves to itself the power to designate any population as a subspecies, on a case-by-case and standardless basis.  *See Trafalgar Cap. Assocs., Inc. v. Cuomo*, 159 F.3d 21, 34 n.11 (1st Cir. 1998) (an "ad-hoc standardless determination . . . is likely to be arbitrary and capricious").  Second, the Service's explanatory failure

allows it to "move the goalposts," always able to alter the level of significance necessary to prove or disprove subspecies status and thereby prevent the public from developing the necessary data to support a delisting petition. *Cf. Qwest Corp. v. FCC*, 689 F.3d 1214, 1228 (10th Cir. 2012) ("[A]n agency's shifting of the policy goalpost . . . may [mean] that the agency has acted arbitrarily or capriciously.").

57.   Therefore, the Service's denial of Plaintiffs' delisting petition was arbitrary and capricious, or otherwise not in accordance with the law, in violation of the ESA, 16 U.S.C. §§ 1533(b)(3)(B), 1540(g)(1)(C).

**Second Claim for Relief**
**Failure To Articulate "Subspecies" Standard**
**(In the Alternative to the First Claim for Relief) (Violation of the APA)**

58.   Plaintiffs incorporate herein by this reference all the allegations set forth in Paragraphs 1 through 57.

59.   The APA provides for review of final agency action when there is no other adequate judicial remedy.   5 U.S.C. § 704.   To the extent that the First Claim for Relief is not cognizable as an ESA citizen suit action, the same is fully re-alleged under the APA.

60.   The Service's failure to articulate a standard or definition for "subspecies," and failure to explain why the data before the agency supported the designation of the gnatcatcher as a subspecies, was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law, 5 U.S.C. § 706(2)(A).

Complaint for Decl. & Inj. Relief

### Third Claim for Relief
### Failure To Notify and Give Opportunity to the
### Public To Comment on Advisory Committee Meetings
### (Violation of the Federal Advisory Committee Act,
### 5 U.S.C. App. 2, § 10(a)(1)-(3), and the APA, 5 U.S.C. § 706(2)(A))

61.   Plaintiffs incorporate herein by this reference all the allegations set forth in Paragraphs 1 through 60.

62.   The Federal Advisory Committee Act imposes important limitations on the ability of administrative agencies to use outside panels and taskforces to inform agency decision-making.  *See, e.g.*, 5 U.S.C. App. 2, § 10(a)(1)-(3).  The Service's reliance on the advice of a privately convened peer review committee, meeting in secret, to deny the delisting petition violates these requirements.

63.   The committee in question was comprised of avian experts identified by an outside contractor at the Service's request.  The committee convened secretly in late summer of 2015 and, pursuant to the Service's agenda, produced a report on the delisting petition.  The report is highly critical of Dr. Zink's work, and was instrumental to the Service's decision to deny the delisting petition.  Indeed, the Service's denial of the delisting petition cites the report some two dozen times.  *See* 81 Fed. Reg. at 59,958-60.  Despite the obvious importance of the panel's convening, the Service did not give the public formal notice of the committee's formation, or an opportunity to observe and participate in the committee's deliberations.  Further, the Service did not give the public an opportunity to comment on the committee's final report.

Complaint for Decl. & Inj. Relief

64.   The Service's failure to give the public adequate notice of the panel's meeting, or to allow the public to attend, participate in, and comment upon the panel's work, was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).

## PRAYER FOR RELIEF

Wherefore, Plaintiffs pray:

**As to the First Claim for Relief:**

That this Court declare the final rule denying the Petition for Delisting the Coastal California Gnatcatcher invalid under the ESA because Defendants failed to identify and articulate a definition of "subspecies."

**As to the Second Claim for Relief (stated in the alternative to the First Claim for Relief):**

That this Court declare the final rule denying the Petition for Delisting the Coastal California Gnatcatcher invalid under the APA because Defendants failed to identify and articulate a definition of "subspecies."

**As to the Third Claim for Relief:**

That this Court declare the final rule denying the Petition for Delisting the Coastal California Gnatcatcher invalid under the Federal Advisory Committee Act because the final rule relies upon the report and recommendations of an advisory committee convened in violation of the Federal Advisory Committee Act.

**As to First and Second Claims for Relief:**

That this Court preliminarily and permanently enjoin Defendants from enforcing or giving effect in any way to the delisting petition denial, and to remand the matter to the Service to (i) articulate a generally applicable definition of subspecies, and (ii) determine whether the gnatcatcher satisfies that definition.

**As to the Third Claim for Relief:**

That this Court preliminarily and permanently enjoin Defendants from enforcing or giving effect in any way to the gnatcatcher expert panel's report.

**As to all Claims for Relief:**

That this Court grant to Plaintiffs an award of their reasonable attorney fees and costs, pursuant to 16 U.S.C. § 1540(g)(4), 28 U.S.C. § 2412, or any other appropriate authority; and

Complaint for Decl. & Inj. Relief

That this Court grant to Plaintiffs any other relief that the Court deems to be proper.

DATED:  November 2, 2017.

Respectfully submitted,

s/ Jonathan Wood

| | |
|---|---|
| DAMIEN M. SCHIFF* | JONATHAN WOOD |
| Cal. Bar No. 235101 | D.C. Bar No. 1045015 |
| E-mail: dms@pacificlegal.org | E-mail: jw@pacificlegal.org |
| ANTHONY L. FRANÇOIS* | Pacific Legal Foundation |
| Cal. Bar No. 184100 | 3033 Wilson Blvd., Suite 700 |
| E-mail: alf@pacificlegal.org | Arlington, Virginia 22201 |
| Pacific Legal Foundation | Telephone: (202) 888-6881 |
| 930 G Street | |
| Sacramento, California 95814 | |
| Telephone: (916) 419-7111 | |
| Facsimile: (916) 419-7747 | |

*Pro Hac Vice Pending

Attorneys for Plaintiffs