**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE, ACCURACY, & RELIABILITY, *et al.*, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | 17-cv-02313 (JDB) |
| | ) | |
| U.S. DEPARTMENT OF INTERIOR, *et al.*, | ) ) | |
| | ) | |
| Defendants, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| NATURAL RESOURCES DEFENSE COUNCIL, INC., *et al.*, | ) ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

**MEMORANDUM IN SUPPORT OF CONSERVATION GROUPS' MOTION
FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................iii

INTRODUCTION ..................................................................................................... 1

BACKGROUND......................................................................................................... 2

I.     The role of subspecies in bird taxonomy and conservation ............................. 2

        A.     Subspecies are distinguishable, geographically discrete groups
               within a species ...................................................................................... 2

        B.     The Endangered Species Act protects subspecies. .................................. 4

        C.     Bird experts typically consider multiple factors when determining
               whether a group of birds is a distinct subspecies ................................... 5

II.    The coastal California gnatcatcher .................................................... 9

III.   FWS's denial of plaintiffs' 2014 petition to delist the coastal California
      gnatcatcher................................................................................... 13

        A.     Plaintiffs petitioned FWS to delist the coastal California
               gnatcatcher ......................................................................................... 13

        B.     Public comments, including comments from scientific experts,
               overwhelmingly urged FWS to reject the petition ............................... 16

        C.     Every expert on an independent panel agreed that the petition did
               not justify delisting the coastal California gnatcatcher ....................... 21

        D.     FWS denied the petition to delist the coastal California
               gnatcatcher ......................................................................................... 24

STANDARD OF REVIEW ......................................................................................... 27

STATUTORY AND REGULATORY FRAMEWORK................................................. 27

ARGUMENT ............................................................................................................ 28

I.     Plaintiffs have not shown that they have standing......................................... 29

II.    FWS properly denied plaintiffs' petition to delist the coastal California
      gnatcatcher.................................................................................... 29

    A.     FWS properly rejected the flawed science underlying the petition ..... 31

    B.     FWS adequately explained its decision to deny the petition................ 33

III.   FWS's consideration of expert opinions from the Workshop participants did not violate the Federal Advisory Committee Act ..................................... 38

    A.     The Workshop was not structured as an "advisory committee"........... 39

    B.     The Workshop was not "established" by FWS ...................................... 39

    C.     The Workshop was not "utilized" by FWS............................................ 41

CONCLUSION........................................................................................................ 43

# TABLE OF AUTHORITIES

## *Cases*

*\*Ala.-Tombigbee Rivers Coalition v. Kempthorne,*
477 F.3d 1250 (11th Cir. 2007) ...................... 33, 36

*\*Am. Wildlands v. Kempthorne,*
530 F.3d 991 (D.C. Cir. 2008) ..................... 4, 27, 32, 35

*Animal Legal Def. Fund, Inc. v. Shalala,*
104 F.3d 424 (D.C. Cir. 1997) ...................... 41

*\*Ass'n of Am. Physicians and Surgeons v. Clinton,*
997 F.2d 898 (D.C. Cir. 1993) ...................... 39

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
462 U.S. 87 (1983) ...................... 27

*Buffalo Field Campaign v. Zinke,*
289 F. Supp. 3d 103 (D.D.C. 2018) ...................... 15–16

*Burlington Truck Lines, Inc. v. United States,*
371 U.S. 156 (1962) ...................... 35

*\*Byrd v. U.S. EPA,*
174 F.3d 239 (D.C. Cir. 1999) ...................... 39–40, 41, 42

*Ctr. for Biological Diversity v. Lohn,*
296 F. Supp. 2d 1223 (W.D. Wash. 2003) ...................... 32–33

*Consolidated Delta Smelt Cases,*
717 F. Supp. 2d 1021 (E.D. Cal. 2010) ...................... 32

*Diamond v. Charles,*
476 U.S. 54 (1986) ...................... 30

*Dole v. Williams Enters., Inc.,*
876 F.2d 186 (D.C. Cir. 1989) ...................... 37

*Food Chem. News v. Young,*
900 F.2d 328 (D.C. Cir. 1990) ...................... 40–41, 42

*Home Builders Ass'n of N. Cal. v. U.S. FWS,*
321 F. App'x 704 (9th Cir. 2009) ...................... 38

*Home Builders Ass'n of N. Cal. v. U.S. FWS*,
    529 F. Supp. 2d 1110 (N.D. Cal. 2007) ...................................................... 31–32

*Humane Soc'y of the U.S. v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) ........................................................................ 5

*Humane Soc'y of the U.S. v. Jewell*,
    76 F. Supp. 3d 69 (D.D.C. 2014) ................................................................... 5

*Humane Soc'y of the U.S. v. Pritzker*,
    75 F. Supp. 3d 1 (D.D.C. 2014) .................................................................. 16

*In re Polar Bear ESA Listing & Sec. 4(d) Rule Litig.*,
    709 F.3d 1 (D.C. Cir. 2013) ............................................................ 35–36, 38

*\*Kern Cty. Farm Bureau v. Allen*,
    450 F.3d 1072 (9th Cir. 2006) ..................................................................... 38

*City of Las Vegas v. Lujan*,
    891 F.2d 927 (D.C. Cir. 1989) .................................................................... 32

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ..................................................................................... 29

*Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ....................................................................................... 35

*Nat'l Ass'n of Home Builders v. EPA*,
    667 F.3d 6 (D.C. Cir. 2011) ........................................................................ 29

*Nat. Res. Def. Council v. EPA*, No. 16-1413,
    --- F.3d ---, 2018 WL 3489939 (D.C. Cir. July 20, 2018) ............................. 29

*New Eng. Power Generators Ass'n v. FERC*,
    707 F.3d 364 (D.C. Cir. 2013) .................................................................... 30

*Pub. Citizen v. U.S. Dep't of Justice*,
    491 U.S. 440 (1989) ............................................................................... 39, 41

*Sierra Club v. Mainella*,
    459 F. Supp. 2d 76 (D.D.C. 2006) .............................................................. 27

*Swanson Group Mfg. LLC v. Jewell*,
    790 F.3d 235 (D.C. Cir. 2015) .................................................................... 29

*Telecomm. Research & Action Ctr. v. FCC,*
    917 F.2d 585 (D.C. Cir. 1990) ........................................................ 30

*Wash. Legal Found. v. U.S. Sentencing Comm'n,*
    17 F.3d 1446 (D.C. Cir. 1994) ...................................................... 42

### Statutes

5 U.S.C. § 706(2) ..................................................................................... 27

5 U.S.C. app. 2, § 3 ................................................................................ 38

16 U.S.C. § 1532(6) ................................................................................. 4

16 U.S.C. § 1532(16) ............................................................................... 4

16 U.S.C. § 1532(19) .............................................................................. 12

16 U.S.C. § 1532(20) ............................................................................... 4

16 U.S.C. § 1533(a) ................................................................................. 4

16 U.S.C. § 1533(b) ...................................................................... 4, 27, 32

16 U.S.C. § 1536(a) ................................................................................ 12

16 U.S.C. § 1536(o) ................................................................................ 13

16 U.S.C. § 1539(a) ................................................................................ 13

### Regulations

50 C.F.R. § 17.3 ...................................................................................... 12

50 C.F.R. § 17.21(c) ............................................................................... 12

50 C.F.R. § 17.31(a) ............................................................................... 12

50 C.F.R. § 17.41(b) ............................................................................... 13

50 C.F.R. § 424.11(d) ...................................................................... 28, 36

71 Fed. Reg. 66,298 (Nov. 14, 2006) ................................................... 16

### Other Authorities

Toews et al., *Plumage Genes and Little Else Distinguish the Genomes of*
    *Hybridizing Warblers*, 26 Current Biology 2313 (2016). .................. 8

**INTRODUCTION**

For twenty-five years, the coastal California gnatcatcher has been protected as a threatened subspecies under the federal Endangered Species Act (ESA). Those protections have led to the conservation of significant swaths of open space necessary for the bird's survival. Building industry groups have repeatedly sought to eliminate those protections by claiming that the bird is not a valid subspecies. And the U.S. Fish & Wildlife Service (FWS) has repeatedly rejected those claims as inconsistent with the best available science.

This pattern has repeated itself twice in recent years. In 2010, a coalition of building industry groups—including two plaintiffs from this case—petitioned FWS to remove, or "delist," the coastal California gnatcatcher from the list of species protected under the ESA, based in part on a study by Dr. Robert Zink. FWS rejected the shoddy science in Dr. Zink's study and denied the petition.

Undeterred, another building industry coalition tried again in 2014. An attorney for developers provided Dr. Zink with funding to conduct another study, in which Zink again concluded the coastal California gnatcatcher is not a valid subspecies. Shortly after that study's publication, five of the six plaintiffs in this case petitioned FWS to delist the coastal California gnatcatcher. FWS undertook an extensive review of the petition and underlying study, solicited public comment, and contracted with a consultant to obtain the individual opinions of several outside experts. At the end of that robust process, the record showed that Dr. Zink's new study was fundamentally flawed, and that the scientific consensus—including the opinions of all six independent experts—supported the continued recognition of the

coastal California gnatcatcher as a distinct subspecies. FWS, applying its expert

judgment, accordingly denied the petition. Plaintiffs now challenge that decision.

This garden-variety Administrative Procedure Act (APA) case fails at the

outset because plaintiffs have not met their burden to show standing. But even on

the merits, plaintiffs' claims fall short. Plaintiffs' attempts to make this case more

complicated than it is, by insisting that principles of "transparent decision-making"

are at stake, stray far from the record and applicable precedent. FWS adequately

explained why it denied the petition to delist the coastal California gnatcatcher, and

had no obligation to provide plaintiffs with a manual on exactly what evidence

would justify delisting the bird in a hypothetical future petition. Nor was the panel

of independent experts, which was formed and controlled by an outside consultant,

subject to the Federal Advisory Committee Act. FWS thoroughly reviewed plaintiffs'

petition, and—consistent with the best available science—properly denied it. The

Court should grant summary judgment for FWS and Conservation Groups.

## BACKGROUND

I.      **The role of subspecies in bird taxonomy and conservation**

   A.      **Subspecies are distinguishable, geographically discrete groups within a species**

Students in high-school biology classrooms across the country learn the basic

hierarchical classification system for all life on earth: from the Kingdom (e.g.,

plants, animals, fungi) all the way down to the Species (e.g., white oak, bald eagle,

shiitake). A broadly "accepted definition" of a species is known as the "biological

species concept." AR019057.[1] Under that concept, the critical characteristic of a species is reproductive capability: a species is a group of individuals that interbreed (or can interbreed) and are reproductively isolated from—that is, cannot interbreed with—other groups. AR022009; *see also* AR019057.

The classification of life, however, extends below the species level to include subspecies. Subspecies classifications recognize the observable differences in appearance or behavior that can exist even between groups of individuals within the same species. In technical terms, a subspecies is "a breeding population that has measurably distinguishable genotypes or phenotypes (or both) and occupies a distinct geographic area within its species range," AR019130, but is not reproductively isolated from the broader species, *see* AR023518.[2] In other words, a subspecies is a group of individuals located in a specific area that is measurably different in some way from, but can still interbreed with, the broader species.

As these general definitions indicate, the species and subspecies classifications focus on "qualitatively different aspects of biology." AR023518. The species classification hinges on reproductive isolation, while the subspecies classification turns on diagnosable differences within the species. *See id.* From a conservation perspective, recognizing and protecting subspecies is important because subspecies represent the "adaptive potential" of the species—that is, the

---

[1] This brief cites the Administrative Record in the form "AR" followed by the bates number.

[2] An organism's genetic makeup is known as its "genotype." An organism's "phenotype" is all of its observable characteristics, such as size, color, and behavior, that result from the interaction of its genotype with its environment.

species' ability to survive in response to changing conditions. *See* AR017475; *see also* AR016916. For instance, a subspecies of the Western toad known as the boreal toad (*Anaxyrus boreas boreas*) has adapted darker skin and bigger feet than the subspecies known as the California toad (*Anaxyrus boreas halophilus*), which lives in lower latitudes and warmer climates.[3] The physical and behavioral differences between subspecies may also, over time, become so significant that the subspecies stop interbreeding, and thus become separate species. *See* AR023476. Without protections at the subspecies level, this diversity within species—and the potential for evolution of new species—would be at risk. *See* AR017504; AR016916.

B. **The Endangered Species Act protects subspecies**

Congress explicitly recognized the importance of protecting subspecies when it passed the ESA in 1973. The ESA establishes baseline federal protections for "species" that the Secretary of Interior determines, based on the "best scientific and commercial data available," are "endangered" or "threatened."[4] 16 U.S.C. § 1533(a)(1), (b)(1)(A). The ESA, however, defines "species" to also "include[] any subspecies of fish or wildlife or plants." *Id.* § 1532(16). In other words, "[t]he ESA treats subspecies . . . as distinct species for listing purposes." *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 994 (D.C. Cir. 2008).

_____

[3] *See Boreal Toad – Anaxyrus boreas boreas*, California Herps, http://www.californiaherps.com/frogs/pages/a.b.boreas.html (last visited July 23, 2018).

[4] A species is "endangered" if it "is in danger of extinction throughout all or a significant portion of its range," 16 U.S.C. § 1532(6), and is "threatened" if it "is likely to become an endangered species within the foreseeable future," *id.* § 1532(20).

The ESA's explicit protection of subspecies "signals Congress's intent to target the Act's provisions where needed, rather than to require the woodenly undifferentiated treatment of all members of a taxonomic species." *Humane Soc'y of the U.S. v. Zinke*, 865 F.3d 585, 598 (D.C. Cir. 2017). This approach is a significant and conscious departure from earlier conservation laws, which focused solely on species-level protections. *See Humane Soc'y of the U.S. v. Jewell*, 76 F. Supp. 3d 69, 78 (D.D.C. 2014). The ESA's protections for subspecies have proved important: as of 2014, around 45% of birds listed as endangered or threatened under the ESA were subspecies. AR019053.

## C. Bird experts typically consider multiple factors when determining whether a group of birds is a distinct subspecies

Despite fairly straightforward definitions, taxonomic classification is complex. "[B]iological classification attempts to inflict an unrealistic categorical scheme on the patterns produced by a disorderly, fundamentally noncategorical process." AR023727. As one scientist explained, "[w]hoever wants to hold firm rules, should give up taxonomic work. Nature is too disorderly for such a man." *Id.*

This complexity, however, has not stopped bird experts from largely agreeing on general standards for subspecies classification. The American Ornithologists' Union, widely considered the "definitive authority" in bird taxonomy, AR013722, defines subspecies as "geographically discrete breeding populations that are diagnosable from other populations on the basis of plumage and/or measurements, but are not yet reproductively isolated." AR017661. Another basic definition of the subspecies concept for birds is "heritable geographic variation in phenotype," or

more simply, genetically based changes in observable features—for example, wing span, plumage color, song, behavior, or habitat preference—within a species across space. AR023518. Beyond those general definitions, however, experts often disagree on precisely where to draw the line when determining whether a particular group of birds is distinct enough to constitute a subspecies. *See* AR002809; AR018410.

The increased availability of genetic analysis over the last decade has provided an additional line of evidence to supplement observable differences in morphology, behavior, and habitat when evaluating a bird's subspecies status. *See* AR019130. Studies that analyze genetic data to inform taxonomic decisions typically compare specific genes or DNA sequences (known as "genetic markers") from different groups of birds to see if those groups are genetically distinct *as to those markers*.[5] This type of analysis, however, is useful only if it looks at appropriate genetic markers for the taxonomic question at issue, *see* AR010872; AR022018, and is conducted using appropriate methods and assumptions, *see* AR022019–21; AR023519–20.

For example, a genetic study into subspecies status must recognize that a subspecies, by definition, may still interbreed with the broader species. *See* AR023518. Continued gene flow between the subspecies and broader species is not only possible, but expected. *See id.*; AR017381. Genetic analyses therefore should

---

[5] For birds, genetic markers can come from either nuclear DNA or mitochondrial DNA. Nuclear DNA is contained in the nucleus of a cell and is inherited from both parents. Mitochondrial DNA is contained in the mitochondrion of a cell and is inherited only from the mother. Nuclear DNA comprises most of a bird's genotype.

anticipate less variation among subspecies within the same species than among different species. *See* AR023475–76. This is particularly true for birds, where gene flow is often greater than in other animals, "leaving genetic differences among groups proportionally smaller." AR019052; *see also* AR019121.

Further, a genetic study that produces "negative results"—that is, one that concludes that, for the genetic markers tested, the potential subspecies is not meaningfully different than the broader species—does not mean that the subspecies does not exist, and should not displace a subspecies determination based on observed physical or ecological (i.e., habitat) differences. *See* AR010873; AR019121. Given the sheer number of genetic markers in a bird's genome, testing a large number of markers is necessary to avoid false negatives. By testing too few markers, the study may miss those markers that reflect the observable physical or behavioral differences between groups of birds. *See* AR010873–74.

Genetic analyses, moreover, are not always well-suited to subspecies evaluation. While genetic studies are useful for revealing "historic reproductive isolation" *between species*, they are less useful for addressing "adaptive divergence" *within species*. *See* AR019121. This is "[b]ecause subspecies represent relatively young points along an evolutionary time scale, [and thus] genetic differentiation between subspecies may not necessarily parallel phenotypic divergence." AR017661. For this reason, it is critical that any genetic analysis select and test genetic markers that evolve quickly enough that they would be expected to show genetic divergence at the subspecies level, if it exists. AR023477–78. The American

Ornithologists' Union nonetheless advises that "subspecies that are phenotypically but not genetically distinct still warrant recognition if individuals can be assigned to a subspecies with a high degree of certainty." AR017661.

Recent "full-genome studies" analyzing the entire genetic makeup of birds underscore the importance of using large numbers of genetic markers. Indeed, these studies have shown how small the genetic differences can be even between separate *species* of birds. For instance, a full-genome study for Europe's carrion crow (left below) and hooded crow (right below) found that genetic variation between the visibly distinct species was limited to less than 1% of the genome. AR023567, 023570.



The results from a similar full-genome study of two species of warblers are more striking. That study found that only a handful of genes—comprising less than one-tenth of one percent of the genome—correlated with the dramatic differences in coloration between the two species.[6]

These recent studies highlight the risk of overinterpreting genetic studies in taxonomic analysis. Trying to find genetic differences between two groups of birds, even those with established physical or behavioral differences, is like "looking for

---

[6] Toews et al., *Plumage Genes and Little Else Distinguish the Genomes of Hybridizing Warblers*, 26 Current Biology 2313, 2314 (2016).

the proverbial needle in a haystack." AR013721. Thus, when a genetic analysis looks at only a few genetic markers, or only at markers that evolve slowly and are unlikely to reflect genetic divergence between the groups of birds, or—worst of all— both, a finding of no genetic difference has minimal probative value. *See* AR010872– 73; AR022018. For this reason, most bird experts recommend weighing all available evidence—morphological, behavioral, ecological, and genetic—when determining whether a group of birds is a distinct subspecies. *See, e.g.*, AR002809; AR014897; AR015148; AR022021–22; AR010873.

## II. The coastal California gnatcatcher

The coastal California gnatcatcher (*Polioptila californica californica*) is a small songbird unique to coastal southern California and northern Baja California. The bird's plumage is dark-blue gray above and grayish-white below. Males have a distinctive black cap, which is absent during winter months; both sexes have a distinctive white eye ring. AR024007.



AR024314. The bird is also known for its distinctive call consisting of a series of kitten-like mews. AR024007.

Bird experts first recognized the coastal California gnatcatcher as a distinct subspecies of gnatcatcher in the 1920s, *see* AR024007, 0240079; AR015098–104, and have continued to recognize it as a distinct subspecies ever since, AR024009. As these experts documented nearly a century ago, the coastal California gnatcatcher looks different, relies on different habitat, and lives in different regions than other California gnatcatchers. Visually, the coastal California gnatcatcher is distinguishable from other California gnatcatchers "by its darker body plumage, less extensive white on tail feathers, and longer tail." AR024032; *accord* AR015153; AR017758. While sometimes subtle, these distinctions are "easily observable to the naked eye," AR015199, as shown by the coastal California gnatcatcher (the top bird in each photo) and California gnatcatcher (bottom bird) specimens from the San Diego Natural History Museum in the images below[7]:

 

Unlike other California gnatcatchers, the coastal California gnatcatcher also relies exclusively on a type of vegetation known as coastal sage scrub for habitat.

---

[7] Garrison Frost, *The Coastal California Gnatcatcher is a Different Bird*, Audubon California (Feb. 18, 2015), http://ca.audubon.org/news/coastal-california-gnatcatcher-different-bird.

AR024032. As a result, the coastal California gnatcatcher's range is limited to where the coastal sage scrub grows: from coastal southern California down into northern Baja California until about 30° North latitude. *See* AR024007. Scientists have considered 30° North latitude to be the southern boundary of the coastal California gnatcatcher's range since 1926. AR015103–04. That same latitude forms the *northern* boundary for the range of the other California gnatcatchers that do not rely on coastal sage scrub for habitat. *See* AR017755–57.

Although the coastal California gnatcatcher was once considered common, its population declined significantly in the latter half of the twentieth century. AR024008. Decades of urban and agricultural development decimated the bird's coastal sage scrub habitat. AR024011. By 1993, FWS estimated that only around 2500 breeding pairs of the bird remained in the United States. AR024008.

In the early 1990s, several environmental groups petitioned FWS to list the coastal California gnatcatcher as endangered under the ESA. *Id.* In 1993, FWS concurred with bird experts' longstanding recognition that the coastal California gnatcatcher was a distinct subspecies of California gnatcatcher, AR016177, and listed the bird as "threatened" under the ESA, AR024016. FWS based its determination that the coastal California gnatcatcher was a distinct subspecies on the same types of evidence that bird experts had been using for decades: differences in morphology (i.e., physical characteristics) and ecology (i.e., habitat). *See* AR024010. FWS principally relied on a peer-reviewed study showing an abrupt change—or "step"—in body and tail color in California gnatcatchers around 30°

North latitude, which also coincides with the southern boundary of the coastal sage scrub habitat on which the coastal California gnatcatcher relies. AR024009–10. This study confirmed the "long-accepted distribution" of the coastal California gnatcatcher in coastal southern California and northern Baja California, AR024009, a distribution that FWS then adopted as the bird's range, AR024007. Since this initial listing, FWS has repeatedly reaffirmed that the coastal California gnatcatcher is a valid subspecies that warrants protection under the ESA. *See* AR024038 (1995 reaffirmance of initial listing decision after remand); AR024349 (2010 reaffirmance of listing decision); AR024366 (2011 denial of petition to delist).

The coastal California gnatcatcher's listing and subsequent critical habitat designations under the ESA provide significant protections for the bird. Federal agencies are required to consult with FWS to ensure their actions do not jeopardize the bird's existence or adversely modify its critical habitat. *See* 16 U.S.C. § 1536(a)(2). And, with limited exceptions, no individual, business, or government entity can "take"—that is, "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect," *id*. § 1532(19)—a coastal California gnatcatcher without a permit. *See* 50 C.F.R. § 17.31(a) (incorporating take prohibition from 50 C.F.R. § 17.21(c)). This ban on "take" includes a ban on "significant habitat modification or degradation" that would kill or injure coastal California gnatcatchers "by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." *Id*. § 17.3. Activities likely to result in "incidental" take of the bird— such as development in its habitat—must conform either to terms and conditions in

an incidental take statement, *see* 16 U.S.C. § 1536(o), an incidental take permit

accompanying a habitat conservation plan, *see id.* § 1539(a)(1)(B), (a)(2), or

gnatcatcher-specific regulations issued under the ESA, *see* 50 C.F.R. § 17.41(b)(2).

All told, the ESA's protections for the coastal California gnatcatcher require

land developers to follow specific regulatory processes to minimize and mitigate

harm to the bird and its habitat. These protections, though developed specifically

for the coastal California gnatcatcher, also benefit the numerous other species that

rely on coastal sage scrub, as well as members of the public who enjoy observing

coastal California gnatcatchers or recreating in the coastal sage scrub ecosystem.

*See* Mem. Supp. Conservation Groups' Mot. to Intervene 11–12, ECF No. 8-2.

## III.   FWS's denial of plaintiffs' 2014 petition to delist the coastal California gnatcatcher

### A.   Plaintiffs petitioned FWS to delist the coastal California gnatcatcher

In May 2014, the Pacific Legal Foundation and attorney Robert Thornton—

representing several building industry groups—petitioned FWS to delist the coastal

California gnatcatcher. AR000001. This petition claimed that a 2013 study by Dr.

Robert Zink showed the coastal California gnatcatcher was not a valid subspecies

eligible for protection under the ESA. AR000015–16.

This was not the first time the Pacific Legal Foundation had relied on Dr.

Zink's work to petition to delist the coastal California gnatcatcher. In April 2010,

the Pacific Legal Foundation submitted a similar petition based on a 2000 study by

Dr. Zink. AR024365. In that study, Dr. Zink analyzed a single genetic marker from

mitochondrial DNA in California gnatcatchers and concluded, based on that single

marker, that coastal California gnatcatchers are not genetically distinct from other California gnatcatchers, and thus genetic evidence did not support recognizing the coastal California gnatcatcher as a distinct subspecies. *See* AR025341.

FWS concluded that the 2010 petition, and Dr. Zink's 2000 study, did not provide a scientific basis to open a formal review of the coastal California gnatcatcher's subspecies status. AR024365. FWS explained that it had reviewed Zink's 2000 study shortly after it was published and sought a review of the study by a panel of seven federal scientists unaffiliated with the coastal California gnatcatcher's listing. AR024367. That panel noted that subspecies determinations should be based on multiple lines of inquiry, including physical, behavioral, and genetic evidence. AR016262. The panel also emphasized that Dr. Zink had looked at "only a single genetic marker among many potential markers," and that other types of markers—in particular, markers with higher mutation rates or that are linked to known physical traits—would be far more relevant to the coastal California gnatcatcher's subspecies status. *Id.* Indeed, the panel observed that under Zink's approach, "few subspecies would be valid, and many *full* species would not be recognized." AR016263. The panel thus rejected Zink's 2000 study and explained that a more robust study of relevant markers would be required to overturn the coastal California gnatcatcher's longstanding subspecies status. *See* AR016262–63. FWS concurred in the panel's assessment and denied the petition in October 2011. AR024368.

After FWS's denial of the 2010 petition, Mr. Thornton—a long-time attorney for developers—"secur[ed]" funding for Dr. Zink to conduct another study. AR025363. In 2013, Dr. Zink published that new study, in which he once again concluded the coastal California gnatcatcher was not a distinct subspecies. AR025356. This time, Zink looked at eight nuclear DNA markers and two mitochondrial DNA markers in California gnatcatchers and found "low" divergence—that is, little difference in the markers of coastal California gnatcatchers compared to California gnatcatchers more generally. *Id.* He also conducted an "ecological niche" model comparing temperature and rainfall data where California gnatcatchers live, and similarly found "insignificant" ecological differences between the areas inhabited by coastal California gnatcatchers and other California gnatcatchers. *Id.* Dr. Zink concluded, based on this analysis and his prior 2000 study, that the coastal California gnatcatcher is not a "discrete, listable" subspecies under the ESA. AR025363. While the study thanked "R. Thornton" for securing funding, it did not disclose Mr. Thornton's ties to developers. *Id.*

In May 2014, only months after Dr. Zink's 2013 study was published and before any rebuttals were published, plaintiffs—represented by the Pacific Legal Foundation and Mr. Thornton—petitioned FWS to delist the coastal California gnatcatcher based on the new study. AR000015. FWS concluded that the petition presented enough information to indicate that delisting the coastal California gnatcatcher "may be warranted," and thus initiated a status review for the bird. AR000323. The standard for a "may be warranted" determination "is not a rigorous

15

one." *See Buffalo Field Campaign v. Zinke*, 289 F. Supp. 3d 103, 106 (D.D.C. 2018) (collecting cases). A petitioner need not present "conclusive evidence" in support of its position, *see Humane Soc'y of the U.S. v. Pritzker*, 75 F. Supp. 3d 1, 11 (D.D.C. 2014), and at this stage, FWS "do[es] not conduct additional research" or "subject the petition to critical review," 71 Fed. Reg. 66,298, 66,298 (Nov. 14, 2006). FWS was explicit that its "may be warranted" finding in this case did not mean that, after a full status review, it would conclude that delisting the coastal California gnatcatcher was warranted. AR000326.

### B. Public comments, including comments from scientific experts, overwhelmingly urged FWS to reject the petition

FWS provided two months for public comment on the petition and the underlying 2013 study by Dr. Zink. AR000323. During that time, FWS received over 38,000 comments from individuals, local governments, and environmental groups urging the agency to deny the petition and maintain ESA protections for the coastal California gnatcatcher. AR017444. Only *two* comments from the general public supported delisting.[8] *Id.*

FWS also received more than a dozen comments from scientists with relevant expertise. These comments overwhelmingly supported the coastal California gnatcatcher's listing as a threatened subspecies. Indeed, only two scientists submitted comments in favor of delisting: Dr. Zink and Dr. Rob Ramey, both of

---

[8] Mr. Thornton—the attorney for developers who helped fund Dr. Zink's 2013 study, AR022022 (citing AR025363), and represented two of the petitioners, AR000001—also submitted a comment in support of delisting. AR000505.

whom are science advisers for the lead petitioner and plaintiff in this case.[9] *See* AR000505. In other words, no scientist without direct ties to petitioners submitted a comment supporting delisting the coastal California gnatcatcher.

To the contrary, the scientists unaffiliated with petitioners all identified serious flaws in Dr. Zink's 2013 study, and thus the petition. Indeed, two of the scientists—Dr. John McCormack, Director and Curator at the Moore Laboratory of Zoology, and Dr. Michael Patten, Professor at the University of Oklahoma Biological Survey—published peer-reviewed rebuttals to Zink's study that they submitted to FWS along with their comments. *See* AR022016 (paper by Dr. McCormack and Dr. James Maley); AR023516 (paper by Dr. Patten).

Most of the unaffiliated scientists criticized Dr. Zink for analyzing both the *wrong type of* and *too few* nuclear markers to properly test whether the coastal California gnatcatcher is a distinct subspecies. *See* AR015198; AR022018; AR010478–79; AR011231; AR011267; AR011322; AR010872–73; AR011220; AR003142. As explained above, the genetic markers used to test for genetic divergence at the subspecies level "should have high mutation rates." AR022018. But Zink selected slowly evolving nuclear markers that "would not be expected to show divergence at the subspecies level." AR010479; *see also* AR010873; AR011231; AR010478–79; AR022018. Indeed, as several scientists pointed out, Dr. Zink chose nuclear markers that evolve *more slowly* than the mitochondrial DNA from his 2000

[9] *See About Us*, Ctr. for Envtl. Science, Accuracy, & Reliability, http://www.bestscience.org/about-us.html (last visited July 25, 2018).

study—a study FWS discounted in part because of how slowly mitochondrial DNA evolves. AR010873; *see* AR022018.

Dr. Zink compounded his error in analyzing the wrong type of genetic markers by testing only a handful of those markers. As a result, he looked for genetic divergence in a very small (and unlikely) part of the California gnatcatcher genome. AR015198–99; AR022018; AR011231. This approach is like a child searching for Easter eggs in only one or two spots where they are unlikely to be stashed, like at a gas station down the street, rather than in her own back yard. Considering where Dr. Zink looked, it is not surprising that he did not find genetic divergence. AR022018.

Many of the unaffiliated scientists further explained that, because of Dr. Zink's flawed marker selection, he had no basis to interpret negative results—that is, a finding of no differences for those markers—as signaling that the coastal California gnatcatcher is not a distinct subspecies. AR011267; AR011231; AR010873; AR011220. As Dr. Kevin Winker, Professor and Curator of Birds at the University of Alaska Museum, explained in his comment, when a study tests only a small part of a genome, "a negative result does not mean that the subspecies is not valid, it just means that you did not find a genetic difference that corresponds with the described [physical] difference" in the subspecies. AR011322. To continue the analogy above, Dr. Zink's approach is the equivalent of the child, having found no Easter eggs at the gas station, giving up the search and concluding that the Easter egg hunt was canceled this year. Dr. Zink could not reasonably interpret his

negative result as dispositive; in doing so, Dr. Zink "failed to adhere to basic scientific principles." *See* AR011220.

Many unaffiliated scientists also identified serious flaws in Dr. Zink's "ecological niche" analysis. Zink limited his analysis to differences in temperature and rainfall across the California gnatcatchers' ranges, and discounted known differences in the types of vegetation the California gnatcatcher subspecies inhabit. AR015199; AR022021; AR003168; AR010479; AR010875–76. By ignoring vegetation changes across the California gnatcatchers' ranges, Zink ignored the central aspect of the coastal California gnatcatcher's known "ecological niche"—its coastal sage scrub habitat. AR015199; AR003168; AR022022. As Dr. McCormack explained, "the 30 degree parallel is not some magic line drawn in the dirt, but a real biogeographic break that is seen in other plants and animals." AR015199. Dr. Zink essentially conceded the shortcomings of his analysis in his study by admitting that "inclusion of other types of variables could yield a different result." AR025363.

Several unaffiliated scientists also highlighted a logical defect in Dr. Zink's approach to subspecies: his analysis leaves no room for subspecies' existence. Dr. McCormack explained that, for Zink, the threshold for subspecies "seems to be that coastal California gnatcatchers must possess a set of genes copies that is *completely different* from those of other populations." AR015199 (emphasis added). But this expectation—known as reciprocal monophyly—"is unrealistic to expect for subspecies, which are defined by the fact that they occasionally interbreed with other populations (otherwise they would be full species)." *Id.* Indeed, by "defining

species through reciprocal monophyly, but requiring the same criterion for subspecies recognition, Zink effectively believes that subspecies . . . should not be given names." AR022020; *see also* AR022049 (1998 Zink study that "discuss[es] the potential use of subspecies names, and recommend[s] that they not be used").

Two of the unaffiliated scientists also showed that Dr. Zink's data, when analyzed properly, actually support genetic and ecological divergence for the coastal California gnatcatcher. Their reanalysis of Zink's genetic data with appropriate statistical tests revealed divergence between coastal California gnatcatchers and other California gnatcatchers for several nuclear markers, even though the markers were not ideal for testing subspecies divergence. *See* AR015198; AR022018–19; AR003144. Likewise, despite the limits of Zink's ecological niche model, its results show "strongly significant [niche] differentiation" between coastal California gnatcatchers and other California gnatcatchers. AR022021.

Finally, Dr. McCormack (in his paper with Dr. Maley) raised concerns about the conflict of interest in the funding behind Dr. Zink's 2013 study. *See* AR022022–23. Drs. McCormack and Maley explained that "[a] conflict of interest occurs in any situation in which the impartiality of a study *might* be undermined by a competing interest, often a funding source." AR022022. Although the "presence of a financial conflict of interest does not necessarily invalidate a study or imply malfeasance," "financial conflicts of interest should be stated openly." AR022022–23. As described above, while Dr. Zink disclosed that funding for his 2013 study was "secur[ed]" by "R. Thornton," he did not disclose that Mr. Thornton had represented developers

opposed to the coastal California gnatcatcher's listing under the ESA. AR025363.

Mr. Thornton (joined by the Pacific Legal Foundation) then went on to sign the

petition at issue here, based primarily on the study he funded. AR000001. This

history provides "important context" for assessing the "study's rationale, methods,

and interpretation," AR022023, and thus the petition as well.

C.     **Every expert on an independent panel agreed that the petition did not justify delisting the coastal California gnatcatcher**

In addition to receiving public comment, FWS contracted with a consultant to

organize a workshop for independent scientific experts (the "Workshop") to provide

individual analyses on several issues, including the best approaches to define

subspecies in birds, Dr. Zink's 2013 study, and whether—based on current

information—the coastal California gnatcatcher is valid subspecies. AR017377.

Each of the six panelists the consultant selected had over 19 years of experience in

multiple relevant fields, including bird conservation, population genetics,

conservation genetics, and taxonomy. AR017375.

Although the panelists were not asked to reach consensus on any issue, *see*

AR017376, their individual opinions were unanimous on several points, AR017381–

82. First, they agreed that Dr. Zink's approach of using reciprocal monophyly to

define subspecies was "not appropriate," because "subspecies are in the process of

evolving to new species and, therefore, some level of gene flow and/or incomplete

lineage sorting is expected." AR017381. Second, they agreed that the genetic

markers Zink analyzed were unlikely to be relevant to the coastal California

gnatcatcher's subspecies status. *Id.* Third, they agreed that genetic evidence—

especially negative results based on "neutral" markers not associated with local adaptation—does not override evidence of divergence based on observable factors like morphology and ecology, particularly when those factors "provide[] a sufficient signal to distinguish subspecies." *Id.* Finally, and most critically, each panelist concluded that the available morphological, ecological, and genetic evidence supported the coastal California gnatcatcher's status as a distinct subspecies. AR017382.

In their individual reports, the panelists articulated slightly different views on exactly when to recognize a distinct subspecies, reflecting the same general debate within the field of bird taxonomy. *Compare, e.g.*, AR017472 (noting "a one size fits all approach to subspecies designation does not work"), *with* AR017494 ("the use of two or more categories of biological criteria to evaluate discreteness or diagnosability is more convincing than relying on morphology alone"), *and* AR017510 (divergence in "a single trait that is biologically significant . . . could provide a reasonable basis" for subspecies status). But the panelists' views were more alike than different. Three of the panelists endorsed the American Ornithologists' Union's "industry standard" definition of subspecies. AR017494; *see also* AR017481, 017486. And *all* recognized that the value—if any—of genetic evidence depended on the rigor and thoroughness of the analysis, *see, e.g.*, AR017382, 017491, and cautioned against overinterpreting "negative" genetic results, especially from limited data sets, *see* AR017382. As one panelist explained, "[a]s for genetics, you are looking for the proverbial needle in a haystack and any

amount of negative results are unlikely to overturn the phenotypic data if the pattern [of divergence] still holds." AR017485; *accord* AR017491–92 (even with advanced testing of large numbers of markers, "the probability of screening the few key genes responding to local selection pressures may still be low").

The panelists' assessments of the merits of Dr. Zink's 2013 study largely mirrored those of the scientists who commented on the delisting petition. Most panelists noted that Zink's selection of a handful of nuclear markers was not suited to identifying subspecies divergence. AR017382. In the words of one panelist, "[t]he genetic data analyzed [by] Zink . . . have no strengths. Inappropriate markers were used to test inappropriate hypotheses." AR017472; *see also* AR017484 ("The genetic data generated and analyzed by Zink . . . [are] not appropriate for testing the subspecies hypothesis."). Despite this fact, most of the panelists also noted that, when "analyzed appropriately"—that is, using generally accepted statistical methods—Zink's data "show[ed] some signs of genetic structure that supported the subspecies classification" for the coastal California gnatcatcher. AR017382.

Most panelists similarly expressed concerns about Dr. Zink's methodology, AR017382, with one panelist calling Zink's interpretation of his results "confusing" and "perplexing." AR017483. All the panelists also rejected Zink's position that subspecies are valid only if they have completely different genes from other species and subspecies. AR017381. One panelist called Zink's position "extreme." AR017475. Another panelist wrote that "Zink's viewpoint [on subspecies] is a minority and fringe one. This viewpoint taints the way he views and analyzes the

data." AR017474. And another panelist observed that Zink's approach, if applied broadly, "would fail to identify and protect" subspecies and "hence would constitute a failure to meet the goals of the US Endangered Species Act." AR017475.

Finally, despite their slightly different standards for recognizing subspecies, each panelist concluded that the best available morphological, ecological, and genetic evidence supports the coastal California gnatcatcher's continued recognition as a distinct subspecies. *See* AR017473, 017477–79, 017483–85, 017491, 017499–500, 017520.

## D. FWS denied the petition to delist the coastal California gnatcatcher

In August 2016, after considering the public comments—including comments submitted by Dr. Zink after the comment period closed—and the Workshop experts' reports, FWS denied the petition to delist the coastal California gnatcatcher. AR002803; *see also* AR002806–08 (describing comments and Workshop reports).

FWS determined that the coastal California gnatcatcher's subspecies status should be based on "all available data . . . , such as ecology, morphology, genetics, and behavior." AR002808. FWS explained that it "base[s] each listing decision on the best scientific and commercial data available for the individual species under consideration," and that "[a]ny data from genetic studies must be considered in the context of the suite of other relevant data available for the particular species." AR002809. FWS thus rejected Dr. Zink and the petition's narrow definition of subspecies based solely on genetic factors, and concluded that "a multi-evidence criteria approach is most appropriate for distinguishing subspecies." AR002810.

Applying its multi-evidence approach, FWS reaffirmed its longstanding conclusion that the coastal California gnatcatcher is a distinct subspecies. First, FWS reaffirmed its prior conclusion that morphological data showing physical differences between coastal California gnatcatchers and other California gnatcatchers, with a step around 30° North latitude where coastal sage scrub habitat ends, remained part of the best available science for its subspecies determination. AR002809, 002813. Neither the petition nor Dr. Zink's 2013 study provided any reason for FWS to reconsider its longstanding position that morphological differences supported the coastal California gnatcatcher's subspecies status. AR002809.

Second, FWS rejected the petition's claims that the genetic data from Dr. Zink's 2000 and 2013 studies undermined the coastal California gnatcatcher's subspecies status. *See* AR002809–12. FWS's critiques of Zink's analysis mirrored those expressed by expert commenters and the Workshop members. In short, FWS concurred "that evaluation of genetic data must be thorough, analyzed using genetic markers appropriate for the time scale of likely divergence, and analyzed using appropriate statistical methods," and that Zink's 2013 study did not meet that standard. AR002811. FWS further found that the "best available genetic information"—based on the reanalysis of Zink's inadequate data by expert commenters and Workshop members—showed slight genetic variation that supported the coastal California gnatcatcher's subspecies status. *Id.*

Third, FWS rejected Dr. Zink's ecological niche analysis as a basis for delisting the coastal California gnatcatcher. AR002812–13. FWS concurred with the expert commenters and the Workshop members' critique that, because the analysis considered only temperature and precipitation, it was "too coarse to reliably detect differences in ecological niches." AR002813. FWS instead concluded that the "best available information indicates that there is a difference in habitat used by populations of the California gnatcatchers north of 30° N. latitude and the populations farther south, and this habitat difference is consistent with both observed morphological differences and the slight genetic variation . . . that occurs at the 30° N. latitude that has defined the southern limit of the range of the coastal California gnatcatcher since the time of listing" in 1993. *Id.*

In sum, FWS found that the best available science for all three lines of evidence—morphology, genetics, and ecology—supports the continued recognition of the coastal California gnatcatcher as a distinct subspecies. *Id.* In addition, although petitioners did not claim that the coastal California gnatcatcher, if a valid subspecies, was no longer "threatened" under the ESA, FWS evaluated the status of the bird and determined that it remains "threatened." *See* AR002813–26. FWS accordingly denied the petition.

Fourteen months later, plaintiffs filed this lawsuit challenging the denial of their petition. *See* Compl., ECF No. 1. Conservation Groups intervened in this suit to defend their and their members' unique interests in the coastal California gnatcatcher and its habitat. *See* Mem. Supp. Mot. to Intervene 1.

## STANDARD OF REVIEW

Summary judgment "serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006). Under the APA, the denial of a delisting petition "must be set aside if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Am. Wildlands*, 530 F.3d at 997 (quoting 5 U.S.C. § 706(2)(A)). "This standard of review is a highly deferential one. It presumes agency action to be valid." *Id.* (internal quotation marks omitted). This deference is at its highest when—as in this case—the agency decides issues at the "frontiers of science" within its area of expertise. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 103 (1983).

## STATUTORY AND REGULATORY FRAMEWORK

Members of the public may petition FWS to remove—or delist—species from the list of endangered and threatened species protected under the ESA. *See* 16 U.S.C. § 1533(b)(3). Upon receiving a petition that FWS concludes "presents substantial scientific or commercial information indicating that the [delisting] may be warranted," *id.* § 1533(b)(3)(A), FWS has twelve months to review the status of the species and determine whether delisting is warranted, *id.* § 1533(b)(3)(B).

The ESA requires that FWS decide whether to delist a species "solely on the basis of the best scientific and commercial data available." *Id.* § 1533(b)(1)(A); *accord Am. Wildlands*, 530 F.3d at 998. For purposes of this case, delisting a species is warranted only if the best scientific and commercial data available now show that

the data FWS relied on when it first listed the species, or the agency's interpretation of that data, "were in error." 50 C.F.R. § 424.11(d)(3).

## ARGUMENT

FWS carefully evaluated and properly rejected plaintiffs' petition to delist the coastal California gnatcatcher. Rather than deny the petition outright, FWS undertook a full status review for the bird. The agency not only solicited public comments on the petition, but also hired a contractor to solicit the independent opinions of outside experts. This robust process produced a clear consensus that the science underlying the petition was unreliable and fell far short of rebutting the coastal California gnatcatcher's longstanding status as a subspecies in need of ESA protection. Indeed, every member of the expert Workshop concluded that the best available science supported the bird's continued recognition as a subspecies. Based on this record, FWS reasonably concluded that the coastal California gnatcatcher is a distinct subspecies, and appropriately denied the petition.

Plaintiffs have not shown that they have standing to challenge FWS's denial of their delisting petition, and their claims fail on that basis alone. But even if plaintiffs have standing, their merits arguments crumble when exposed to the record and binding precedent. FWS adequately explained its decision to reject the science underlying plaintiffs' petition, and how the best available science supported its conclusion that the coastal California gnatcatcher is a distinct subspecies. Neither the ESA nor APA required FWS to do more to justify its decision to deny the petition. Moreover, D.C. Circuit precedent forecloses plaintiffs' claims that FWS violated the Federal Advisory Committee Act (FACA) when it reasonably considered

the opinions of the Workshop experts when evaluating the petition. The Court should grant summary judgment for FWS and Conservation Groups as to all counts in plaintiffs' complaint.

## I. Plaintiffs have not shown that they have standing

"The party invoking federal jurisdiction bears the burden of establishing" standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). At summary judgment, a plaintiff must set forth by affidavit or other evidence specific facts that, accepted as true, demonstrate standing. *Id.* Plaintiffs have not done so here.

Five of the six plaintiffs in this case did not submit any evidence in support of standing and therefore have failed to meet their burden. *See Swanson Group Mfg. LLC v. Jewell*, 790 F.3d 235, 242 (D.C. Cir. 2015) (associational plaintiffs lacked standing when they did not "identify individual injured members"); *accord Nat. Res. Def. Council v. EPA*, No. 16-1413, -- F.3d ---, 2018 WL 3489939, at *2 (D.C. Cir. July 20, 2018). Plaintiff Center for Environmental Science, Accuracy, & Reliability (CESAR), however, did submit declarations in support of standing. *See* Decl. of Robert M. Zink, ECF No. 24-1; Decl. of Jean Sagouspe, ECF No. 24-2. Because CESAR does not appear to claim organizational standing, *see* Mem. P. & A. Supp. Pls.' Mot. Summ. J. (Pls.' Br.) 2 n.2, ECF No. 24 (failing to address injury to CESAR as an organization), it must rely on the standing of its members to bring this action. *See Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 11–13 (D.C. Cir. 2011) (distinguishing organizational and representational standing).

The only member declaration[10] submitted by CESAR—from Dr. Zink—fails to show any injury-in-fact traceable to FWS's denial of the delisting petition.[11] Dr. Zink believes "the coastal California gnatcatcher should not be considered a separate subspecies," *see* Zink Decl. ¶ 5, and claims the relief requested "would be of significant help to [him] and [his] colleagues in planning future research projects" related to the bird, *id.* ¶ 8. Dr. Zink does not, however, explain how FWS's continued protection of the coastal California gnatcatcher harms him—an academic from Nebraska—in a personal, concrete way. His disagreement with FWS's petition denial, "however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Diamond v. Charles*, 476 U.S. 54, 62 (1986). Likewise, his academic interest "in the gnatcatcher taxonomic debate," *see* Pls.' Br. 2 n.2, or in how FWS determines a bird's subspecies status "does not by itself confer standing where, as here, it is 'uncoupled' from any injury in fact caused by the substance of the [agency] action." *Telecomm. Research & Action Ctr. v. FCC*, 917 F.2d 585, 588 (D.C. Cir. 1990); *see also New Eng. Power Generators Ass'n v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) ("[N]either [an agency] decision's legal reasoning nor the precedential effect of such reasoning confers standing unless the substance of the decision itself gives rise to an injury in fact."). Because Dr. Zink has not shown that

---

[10] As FWS points out, CESAR's articles of incorporation state—contrary to its declarations in this case—that it "has no members." Fed. Defs.' Mem. Supp. Cross-Mot. Summ. J. (FWS Br.) 20 n.13, ECF No. 26 (quoting ECF No. 26-1 at 2).

[11] The first two counts in plaintiffs' complaint directly challenge FWS's denial of the delisting petition under the ESA and APA. Compl. ¶¶ 51–60. The final count, while brought under FACA, *id.* ¶¶ 61–64, is in effect a challenge to the petition denial as well, because plaintiffs seek relief declaring that denial "invalid," *id.* at 21.

he is harmed by the *substance* of FWS's denial of the delisting petition, he lacks

standing to challenge that action. CESAR therefore lacks standing as well.

Because plaintiffs have failed to show they have standing, the Court should

grant summary judgment for FWS and Conservation Groups as to all counts in

plaintiffs' complaint.

## II. FWS properly denied plaintiffs' petition to delist the coastal California gnatcatcher

### A. FWS properly rejected the flawed science underlying the petition

FWS reasonably rejected Dr. Zink's 2013 study on which plaintiffs based

their petition to delist the coastal California gnatcatcher. FWS considered that

study through a rigorous process including public comment, internal review, and

review by the six independent Workshop experts. *See* AR000323; AR017377–78.

Every scientist unaffiliated with plaintiffs who commented on the petition,

including all six Workshop experts, identified serious and disqualifying defects in

Dr. Zink's study. *See, e.g.*, AR017472 ("The genetic data analyzed [by] Zink . . . have

no strengths. Inappropriate markers were used to test inappropriate

hypotheses . . . ."); AR017484 ("The genetic data generated and analyzed by Zink . . .

[are] not appropriate for testing the subspecies hypothesis."). These scientists'

critiques outlined significant methodological defects, noted an undisclosed conflict of

interest in the study's funding, and showed that Zink's data, when properly

analyzed, actually support genetic and ecological divergence for the coastal

California gnatcatcher. *See supra* 16–24. Faced with overwhelming evidence that

Dr. Zink's study was "flawed to the point of not being reliable," *see Home Builders*

*Ass'n of N. Cal. v. U.S. FWS*, 529 F. Supp. 2d 1110, 1121 (N.D. Cal. 2007), FWS properly rejected the study's findings. AR002813 (concluding that Zink's studies and comments "do not provide sufficient information to support the petition's assertion that the coastal California gnatcatcher is not a valid subspecies and was listed in error"). This determination was well within FWS's expert discretion. *See Am. Wildlands*, 530 F.3d 1000–01 ("The rationale for deference is particularly strong when the [agency] is evaluating scientific data within its technical expertise . . . ." (alteration original) (internal quotation marks omitted)).

Indeed, it would have been unreasonable for FWS to rely on Dr. Zink's 2013 study to delist the coastal California gnatcatcher. FWS is required to base its listing decisions on the best available science, 16 U.S.C. § 1533(b)(1)(A), and therefore may not disregard "scientifically superior evidence" in the record, *City of Las Vegas v. Lujan*, 891 F.2d 927, 933 (D.C. Cir. 1989). Had FWS delisted the coastal California gnatcatcher based on Dr. Zink's deeply flawed study—in the process disregarding the peer-reviewed rebuttals of that study, historical morphological and ecological evidence, the recommendations of all six independent Workshop experts, and the comments of every scientist unaffiliated with petitioners in the record—its action would have been arbitrary and capricious. *See Consolidated Delta Smelt Cases*, 717 F. Supp. 2d 1021, 1066 (E.D. Cal. 2010) (FWS's failure to use "normalized salvage data," despite "agreement among all the experts [including an independent peer review] that the best available, scientifically accepted methodology is to use normalized salvage data," was arbitrary and capricious); *Ctr. for Biological*

*Diversity v. Lohn*, 296 F. Supp. 2d 1223, 1236–40 (W.D. Wash. 2003) (agency erred in relying on single orca taxon where biological review team, as well as other evidence in the record, found that such classification is inaccurate and outdated), *vacated and remanded on other grounds*, 511 F.3d 960 (9th Cir. 2007).

### B.    FWS adequately explained its decision to deny the petition

FWS reasonably relied on the consensus of the scientific community when it concluded that the coastal California gnatcatcher is a distinct subspecies and thus denied plaintiffs' delisting petition. FWS's decision is consistent with the agency's decades-old position, *see* AR024007 (FWS's 1993 listing decision); AR024365 (rejecting 2010 delisting petition), the comments of *every* scientist unaffiliated with the petitioners, the opinion of *all six* independent Workshop experts, *see* AR002806–08; AR017381–82, and the position of bird experts for nearly a century, *see* AR024007, 024009; AR015098–104. Even the data from Dr. Zink's 2013 study, when analyzed using accepted statistical methods, provides genetic and ecological support for the coastal California gnatcatcher's subspecies status. *See* AR015198–99; AR022018–21; AR017483. Petitioners, in short, provided no persuasive evidence to support their claim that the coastal California gnatcatcher's listing was "in error." *See* AR002811, 002813. At minimum, FWS's decision to follow the scientific consensus on the taxonomic status of the coastal California gnatcatcher deserves deference. *See Ala.-Tombigbee Rivers Coalition v. Kempthorne*, 477 F.3d 1250, 1260 (11th Cir. 2007) ("Given all of that support for the view taken in the Final Rule, we will not find that the Service failed to consider the best scientific evidence simply because it decided not to credit the contrary view [of plaintiffs]."); *see also Am.*

*Wildlands*, 530 F.3d at 1000 (deferring to FWS where record evidence supported its decision on how to consider genetic evidence in listing decision).

Plaintiffs effectively concede this point. They do not argue that FWS improperly rejected Dr. Zink's 2013 study. Nor do they argue that FWS erred in concluding that the best available science continued to support the coastal California gnatcatcher's subspecies status. Instead, they assert that FWS acted illegally by failing to provide a more specific definition of subspecies in its decision. *See* Pls.' Br. 22. This argument lacks any basis in the record or law.

Contrary to plaintiffs' suggestion, FWS explained every step of its analysis leading to its conclusion that the coastal California gnatcatcher is a valid subspecies. AR002808–13. FWS explained why it rejected petitioners' proposal to condition subspecies status on reciprocal monophyly. AR002810. FWS further explained that it considered "multi-evidence criteria involving multiple lines of genetic, morphological, and ecological scientific data to provide the best approach to determining the taxonomic status of the coastal California gnatcatcher." *Id.* And then FWS applied its factual findings to that standard, explaining why, even considering Dr. Zink's 2013 study and the petition's arguments, each element of the multi-evidence standard supported the continued recognition of the coastal California gnatcatcher as a distinct subspecies. *See* AR002813 ("Multi-evidence criteria involving multiple lines of genetic, morphological, and ecological scientific data support our recognition of the coastal California gnatcatcher as a distinguishable subspecies."); AR002809–10 (discussing morphological data),

002810–12 (evaluating genetic data), 002812–13 (evaluating ecological data). In doing so, FWS satisfied its central obligation in evaluating the petition: to "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168 (1962)).

Plaintiffs' claim that FWS was required to do more is baseless. Plaintiffs rely largely on clichés taken out of context from cases that bear no resemblance to this one. *See, e.g.*, Pls.' Br. 22. They cite no cases, however, to support their novel argument that FWS needed to set forth a more precise subspecies definition to justify its decision. The ESA mandates that FWS follow the best available science for delisting decisions, *see Am. Wildlands*, 530 F.3d at 998, and the best available science supports the multi-evidence standard FWS adopted and applied, *see, e.g.*, AR002809 (noting that all six Workshop experts "affirmed that multi-evidence criteria should be used for distinguishing the coastal California gnatcatcher as a subspecies"). Indeed, as plaintiffs' brief makes clear, the best available science does not at this point support a more specific subspecies definition for the coastal California gnatcatcher, *see* Pls.' Br. 26–27; *see also* AR002809, much less the "minority and fringe" definition plaintiffs support, *see* AR017474.[12]

---

[12] To the extent plaintiffs are claiming that FWS was required to provide a subspecies definition that would apply to *all* birds—not just the coastal California gnatcatcher—FWS explained why the best available science does not support such a one-size-fits-all approach. *See* AR002810. Moreover, the D.C. Circuit has endorsed FWS's practice of applying statutory terms on a "case-by-case basis in each listing

Nor, even if the best available science did support a more specific subspecies definition, would FWS have been required to adopt one to act on the petition in this case. FWS regulations permit delisting of a subspecies when new data or analysis show that the data or analysis underlying the initial listing "were in error." 50 C.F.R. § 424.11(d)(3). But plaintiffs' petition did not come close to making that showing. *See* AR002813. FWS rejected the studies and arguments in plaintiffs' petition and found that the genetic data from Dr. Zink's 2013 study, when analyzed properly, "provides some support for the distinguishability of the coastal California gnatcatcher as a subspecies." AR002811. FWS's decision to interpret the "slight genetic variation" shown by the reanalysis of Dr. Zink's data, *see* AR002813, in conformity with its longstanding conclusion that morphological and habitat differences support the coastal California gnatcatcher's status as a distinct subspecies, was entirely reasonable. *Cf. Ala.-Tombigbee Rivers Coalition*, 477 F.3d at 1259 (holding that FWS's "decision to read the mixed genetic data in conformity with the remainder of the taxonomic record, which supported classifying the Alabama sturgeon as a distinct species, was not arbitrary and capricious").

Plaintiffs' motley references to yardsticks, Pls.' Br. at 22, goalposts, *id.* at 23, and omelets, *id.* at 24, are premised on an alternate reality in which FWS did not adequately explain its decision to deny the delisting petition. Those metaphors therefore fall flat. FWS's multi-evidence standard—along with the ESA and APA's

---

decision." *See In re Polar Bear ESA Listing & Sec. 4(d) Rule Litig.*, 709 F.3d 1, 15 (D.C. Cir. 2013) (applying case-by-case approach to the term "foreseeable").

statutory requirements—provide the Court with the necessary "yardsticks" to evaluate the petition denial. *Contra id.* at 22. FWS's multi-evidence standard, furthermore, is not analogous to an underspecified *recipe for preparing* an egg dish. *Contra id.* at 24. Instead, it is more like a guide for determining whether an *already prepared* egg dish is a sauce béarnaise (i.e., a species) or an omelet (i.e., a distinct subspecies). When an agency determines that all relevant factors point to the dish being an omelet—or, as is the case here, the coastal California gnatcatcher being a distinct subspecies—the wisdom of the "now-infamous 'duck test'" applies: "WHEREAS it looks like a duck, and WHEREAS it walks like a duck, and WHEREAS it quacks like a duck, WE THEREFORE HOLD that it is a duck." *See Dole v. Williams Enters., Inc.*, 876 F.2d 186, 188 n.2 (D.C. Cir. 1989).

A close read of plaintiffs' filings, moreover, betrays their true purpose in this case: It is not to better understand why FWS denied their petition. It is to force FWS to set "a standard for falsifying the gnatcatcher subspecies hypothesis," Pls.' Br. 32, so they can then fund or conduct research designed to meet that standard and support future petitions to delist the coastal California gnatcatcher and other subspecies whose protections they oppose, *see* Zink Decl. ¶ 8 (stating a more specific standard would help "in planning future research projects on dubious subspecies, such as the gnatcatcher"). This is, ironically, exactly the type of "advocacy science" plaintiffs insist they are trying to combat through this litigation. *See* Pls.' Br. 31.

Given FWS's robust explanation for why it denied the delisting petition—and the ample record support for that decision—this Court should reject plaintiffs'

"attempt to mandate that FWS answer [their] particular questions before making a listing decision." *See Kern Cty. Farm Bureau v. Allen*, 450 F.3d 1072, 1081 (9th Cir. 2006). Just as "FWS is not required to state a threshold level of habitat loss that is necessary to find a species is threatened," *Home Builders Ass'n of N. Cal. v. U.S. FWS*, 321 F. App'x 704, 705 (9th Cir. 2009) (citing *Kern Cty. Farm Bureau*, 450 F.3d at 1081–82), it is not required to state—as plaintiffs desire—a threshold level of differentiation that is necessary to identify a subspecies. It is enough that FWS discussed the best available science and reasonably applied that science to its multi-evidence standard. *See In re Polar Bear ESA Listing & Sec. 4(d) Rule Litig.*, 709 F.3d at 16 ("That Appellants might have chosen a different period of foreseeability is of no moment so long as the agency's decision was justifiable and clearly articulated."); *Kern Cty. Farm Bureau*, 450 F.3d at 1081 ("FWS's discussion of the data and analysis of the extinction factors adequately satisfied its ESA requirements."). Plaintiffs' abstract disagreement with FWS's broader subspecies approach is beyond the scope of this case.

## III. FWS's consideration of expert opinions from the Workshop participants did not violate the Federal Advisory Committee Act

Plaintiffs' claims under FACA fail for a simple reason: FACA did not apply to the Workshop. FACA imposes procedural, transparency, and informational requirements on an "*advisory committee*" that is "*established* or *utilized* by one or more agencies, in the interest of obtaining advice or recommendations for . . . one or more agencies or officers of the Federal Government." 5 U.S.C. app. 2, § 3(2) (emphases added). The Workshop, however, was not structured as an "advisory

committee." Nor was it "established" or "utilized" by FWS. FACA therefore did not apply to the Workshop, and plaintiffs' FACA claims fail as a matter of law.

### A. The Workshop was not structured as an "advisory committee"

Whether a group is an "advisory committee" subject to FACA depends, in part, on the "the formality and structure of the group." *Ass'n of Am. Physicians & Surgeons v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993). Critically, "a group is a FACA advisory committee when it is asked to render advice or recommendations, *as a group*, and not as a collection of individuals." *Id.* at 913. Because the Workshop's members "were not asked to reach consensus," and instead provided individual, anonymous memoranda to the consultant FWS hired to set up and manage the Workshop, *see* AR017376–77, the Workshop was not structured as an advisory committee to which FACA might apply. *See Ass'n of Am. Physicians*, 997 F.2d at 913; *see also* FWS Br. 36–38. That the Workshop's members ultimately agreed on many key issues—including that the coastal California gnatcatcher is a valid subspecies, AR017381–82—underscores the reasonableness of FWS's petition denial, but is irrelevant to FACA's applicability. *Contra* Pls.' Br. 39.

### B. The Workshop was not "established" by FWS

Even if the Workshop had been structured as an advisory committee, Circuit precedent forecloses any claim that FWS "established" the Workshop. An advisory committee is "established" by an agency "only if it is actually formed by the agency." *Byrd v. U.S. EPA*, 174 F.3d 239, 245 (D.C. Cir. 1999) (citing *Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 452, 456–57 (1989)). Under this standard, the D.C. Circuit has held that an agency does not "establish" an advisory committee when it

hires a third-party contractor to select and convene a panel of outside, independent experts. *Id.* at 241, 246–47.

In *Byrd*, the Environmental Protection Agency (EPA) contracted with a private consultant, the Eastern Research Group (ERG), to "select a panel of qualified experts" and conduct a peer review of an agency report. *Id.* at 241. The court rejected the plaintiff's argument that EPA "effectively created" the panel by "conceiving of the need for" it and "hiring ERG to handle the logistics." *Id.* at 246. ERG compensated the panelists, and although "EPA provided a list of suggested panel members to ERG, ERG was not required to select its members from that list and two of the panel members were not on the EPA list." *Id.* Because EPA itself did not select the panel's members, the Court held that it did not "establish" the panel under FACA. *Id.* at 247.

*Byrd* controls here. FWS did not participate "in any portion of the selection process" for Workshop members. AR002807. FWS instead contracted with Amec Foster Wheeler Infrastructure and Environment (Amec) to select the expert panelists. *Id.* In fact, FWS was far less involved in the selection of panelists than EPA was in *Byrd. Compare id.* (explaining FWS was not aware of the panelists' identities until the Workshop convened), *with Byrd*, 174 F.3d at 246 (explaining EPA provided a list of suggested panelists to ERG). Because FWS did not select the Workshop's members, *Byrd* forecloses any claim that FWS "established" the Workshop. *See Byrd*, 174 F.3d at 247; *see also Food Chem. News v. Young*, 900 F.2d

328, 333 (D.C. Cir. 1990) (holding that the agency did not "establish" an expert

panel under FACA where a third-party contractor selected the panel's members).

### C.  The Workshop was not "utilized" by FWS

Circuit precedent also contravenes any claim that FWS "utilized" the

Workshop. An agency "utilizes" an advisory committee only when it exercises

"something along the lines of *actual management or control*" over the committee.

*Byrd*, 174 F.3d at 246 (quoting *Animal Legal Def. Fund, Inc. v. Shalala*, 104 F.3d

424, 430 (D.C. Cir. 1997)); *see also Food Chem. News*, 900 F.2d at 332–33

(explaining the "utilized" standard describes a group "so 'closely tied' to an agency

as to be amenable to 'strict management by agency officials'" (quoting *Pub. Citizen*,

491 U.S. at 457–58, 462)). This is a "stringent standard." *Animal Legal Def. Fund*,

104 F.3d at 430. "[E]ven an agency's 'significant influence' over a committee's

deliberations does not qualify as management and control such that the committee

is utilized by the agency under FACA." *Byrd*, 174 F.3d at 246.

FWS's influence over the Workshop does not rise to the level of "actual

management or control." FWS did not take part "in any portion of the selection

process" for panelists, and only participated in the Workshop's two-day meeting

during a twenty-minute question-and-answer session where FWS staff clarified

"previous Federal actions and Service policies."[13] AR002807; *see also* AR017381.

---

[13] The record belies plaintiffs' characterization of this brief question-and-answer session. The Workshop members "determined it was unnecessary to reexamine data" regarding the morphology of the coastal California gnatcatcher, AR017381, not because FWS's presentation on the topic was "so persuasive," Pls.' Br. 35, but because the data had been "reviewed repeatedly and there was also no new morphology data to modify those original datasets," AR017381.

Although FWS proposed edits to Amec's summary report, those edits were largely "editorial," AR013585, and sought to ensure "a high level of detail and accuracy as to how th[e] Workshop process was planned and conducted." AR013586; *see also* AR017638–39 (matrix listing FWS comments on draft summary report); AR013244–63. More importantly, FWS did not edit or comment on the Workshop members' individual memoranda reflecting their personal expert opinions. Overall, FWS's proposed edits and comments on Amec's summary report are not the type of directives indicative of "strict management by agency officials." *See Food Chem. News*, 900 F.2d at 333.

*Byrd* once again is instructive. In that case, EPA "provided list of experts from which ERG was to select panel, reserved final authority to approve composition of panel, consulted with ERG on choice of chairman and agenda, presented charge to panel in pre-meeting conference call," and sent staff who "attended the meeting and effectively participated." *Byrd*, 174 F.3d at 247. The D.C. Circuit nonetheless concluded that EPA's conduct fell short of the "stringent" requirements for "actual management or control." *Id.* So too here. While FWS certainly had influence over the Workshop's creation and agenda, "influence is not control." *Wash. Legal Found. v. U.S. Sentencing Comm'n*, 17 F.3d 1446, 1451 (D.C. Cir. 1994). Indeed, even "'significant' influence does not represent the level of control necessary to establish that a government agency 'utilized' an advisory panel." *Byrd,* 174 F.3d at 247. Because Amec—not FWS—controlled the Workshop, FWS did not "utilize" the Workshop under FACA.

## CONCLUSION

For the foregoing reasons, the Court should grant summary judgment for

FWS and Conservation Groups as to all counts in plaintiffs' complaint.

July 30, 2018                                    Respectfully submitted,

/s/ Jared E. Knicley
Jared E. Knicley (D.C. Bar 1027257)
Natural Resources Defense Council
1152 15th Street NW, Suite 300
Washington, DC 20005
202-513-6242
jknicley@nrdc.org

Rebecca J. Riley (*pro hac vice*)
Natural Resources Defense Council
20 N. Wacker Drive, Suite 1600
Chicago, IL 60606
312-651-7913
rriley@nrdc.org

*Attorneys for Defendant-Intervenors Natural
Resources Defense Council, Endangered
Habitats League, and Laguna Greenbelt*

/s/ Elizabeth Forsyth
Elizabeth Forsyth (*pro hac vice*)
800 Wilshire Boulevard, Suite 1000
Los Angeles, CA 90017
415-217-2126
eforsyth@earthjustice.org

*Attorney for Defendant-Intervenor National
Audubon Society*

/s/ Ryan Adair Shannon
Ryan Adair Shannon (D.D.C. Bar OR00007)
Center for Biological Diversity
P.O. Box 11374

Portland, OR 97211
503-283-5474 ext. 407
rshannon@biologicaldiversity.org

*Attorney for Defendant-Intervenor Center for Biological Diversity*