IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE, ACCURACY & RELIABILITY, et al., | ) ) ) ) | No. 1:17-cv-02313-JDB |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| UNITED STATES DEPARTMENT OF INTERIOR, et al., | ) ) ) | |
| Defendants, | ) ) | |
| NATURAL RESOURCE DEFENSE COUNCIL, INC., et al., | ) ) ) | |
| Defendant-Intervenors. | ) ) | |

**PLAINTIFFS' REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO CROSS-MOTIONS FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION ............................................................................................. 1

ARGUMENT ..................................................................................................... 2

   I.   The Court has jurisdiction to hear both claims advanced by Plaintiffs ....... 2

  II.   The Service's failure to articulate a standard or definition for
      what constitutes—or does not constitute—a subspecies is
      arbitrary and capricious ......................................................................... 10

 III.   The Service's reliance on the Science Workshop Panel violated
      the Federal Advisory Committee Act and thereby vitiated the
      delisting petition denial ......................................................................... 16

     A.   The Service established or utilized the Science Workshop
         Panel as an advisory committee under FACA ................................. 16

     B.   The Service used the panel's work product as a group contribution ....... 18

     C.   Plaintiffs did not sit on their rights ................................................ 20

     D.   The Service's FACA violations were not harmless ........................ 22

CONCLUSION ................................................................................................. 25

CERTIFICATE OF SERVICE ......................................................................... 26

i

## TABLE OF AUTHORITIES

### Cases

*Ala.-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103 (11th Cir. 1994) ............22

*Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007)................13

*American Petroleum Institute v. Costle*, 665 F.2d 1176 (D.C. Cir. 1981) .........................24

*American Society of Dermatology v. Shalala*, 962 F. Supp. 141 (D.D.C. 1996)................19

*American Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008)..............................13

*Animal Welfare Inst. v. Kreps*, 561 F.2d 1002 (D.C. Cir. 1977) ........................................ 5

*Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*,
    997 F.2d 898 (D.C. Cir. 1993) .....................................................................................20

*Byrd v. EPA*, 174 F.3d 239 (D.C. Cir. 1999) ................................................................16-18

*Cal. Forestry Ass'n v. U.S. Forest Serv.*, 102 F.3d 609 (D.C. Cir. 1996) ......................... 21

*Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191 (D.D.C. 2012) ..................13

*Ctr. for Biological Diversity v. Badgley*, 335 F.3d 1097 (9th Cir. 2003) ..........................13

*Diamond v. Charles*, 476 U.S. 54 (1986).......................................................................... 7

*Food Chemical News v. Young*, 900 F.2d 328 (D.C. Cir. 1990)................................16, 18

*Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003) ..............................................6-7

*Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98 (D.D.C. 2013)........................ 19-20

*Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333 (1977)............................ 10

*Idaho Farm Bureau Fed'n v. Babbitt*, 900 F. Supp. 1349 (D. Idaho 1995).....................22

*In re Navy Chaplaincy*, 697 F.3d 1171 (D.C. Cir. 2012)..................................................... 3

*In re Polar Bear ESA Listing & Sec. 4(d) Rule Litig.*,
    709 F.3d 1 (D.C. Cir. 2013).......................................................................................... 14

ii

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ........................................................ 5-6

*Natural Resources Defense Council v. Pena*,
  147 F.3d 1012 (D.C. Cir. 1998) ..................................................................... 21-22

*New England Power Generators Ass'n v. FERC*,
  707 F.3d 364 (D.C. Cir. 2013) ............................................................................ 7

*Northwest Forest Resource Council v. Espy*,
  846 F. Supp. 1009 (D.D.C. 1994) ...................................................................... 25

*Oglala Sioux Tribe v. U.S. Nuclear Reg. Comm'n*, No. 17-1059,
  2018 WL 3490073 (D.C. Cir. July 20, 2018) .................................................. 24

*Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440 (1989) ............................... 16

*Sierra Club v. FERC*, 827 F.3d 59 (D.C. Cir. 2016) .............................................. 3

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ................................................. 5, 21

*Telecomms. Research & Action Ctr. v. FCC*, 917 F.2d 585 (D.C. Cir. 1990) ................... 7

*United States v. SCRAP*, 412 U.S. 669 (1973) ...................................................... 7

*Western Watersheds Project v. United States Forest Service*, Nos. CV-07-151,
  CV-07-241, 2009 WL 3199120 (D. Idaho Sept. 26, 2009) ............................. 22

*WildEarth Guardians v. Jewell*, 738 F.3d 298 (D.C. Cir. 2013) ................................. 3, 10

## Statutes

16 U.S.C. § 1532(6) ............................................................................................ 13

16 U.S.C. § 1532(16) .......................................................................................... 15

16 U.S.C. § 1532(20) .......................................................................................... 13

16 U.S.C. § 1533(b)(1)(A) ................................................................................... 11

Cal. Corp. Code § 5056(a) ................................................................................... 3

Cal. Corp. Code § 5332(a) ................................................................................... 3

iii

## Other Authorities

Joyce, S.J., George Hayward, *Principles of Logic* (3d ed. 1956) ..................................... 14

Vazquez-Miranda, Hernan, *et al.*, *Morphological and molecular evolution
   and their consequences for conservation and taxonomy in the Le Conte's
   Thrasher (*Toxostoma lecontei*)*, 48 J. Avian Bio. 1 (2017) ....................................... 12

Zink, Robert M., *The role of subspecies in obscuring avian biological diversity
   and misleading conservation policy*, 271 Proc. R. Soc. Lond. 561 (2004).................... 4

iv

## INTRODUCTION

This lawsuit challenges the failure of Defendant United States Fish and Wildlife Service to articulate and use a clear, consistent, and rational standard to determine whether the coastal California gnatcatcher constitutes its own subspecies. The principal responses of the Service and Intervenors to Plaintiffs' charge are to direct the Court's attention to evidentiary standards, or to the number of taxonomists who would affirm the gnatcatcher's subspecies status. But these defenses miss the point. Whatever the types of evidence or the methods for collecting evidence that the Service prefers, the agency still must select a rule or standard to apply to that evidence to determine whether the gnatcatcher qualifies as a subspecies under the Endangered Species Act. And in stating any such rule or standard, the Service must do more than merely cite majority opinion among avian taxonomists, because—as the Service itself acknowledges, AR002809— there is no agreement among them as to *why* any bird population should be considered its own subspecies.

One of those taxonomists is Dr. Robert Zink, a member of lead Plaintiff Center for Environmental Science, Accuracy & Reliability (CESAR). Dr. Zink has spent the bulk of his professional career advocating for clear, consistent, and rational standards of subspecies diagnosis. The Service's petition denial rejects Dr. Zink's efforts. It does so by relying on a secretly convened review panel which

1

produced a report highly critical of the work of Dr. Zink and his research team (which includes Dr. George Barrowclough, an esteemed avian geneticist and associate curator of the American Museum of Natural History). The Service's closed-door committee gauntlet violates the Federal Advisory Committee Act (FACA), and is reason enough to set aside the petition denial. But even without the FACA violation, the Service's petition denial is infirm, for neither it nor the agency's or Intervenors' briefing in this Court provides any rule or standard for diagnosing subspecies. This definitional lacuna entitles Dr. Zink, and through him CESAR on behalf of all Plaintiffs, to litigate this case. It also renders the Service's petition denial arbitrary and capricious.

## ARGUMENT

## I.   The Court has jurisdiction to hear both claims advanced by Plaintiffs

The Service and Intervenors contend that Plaintiffs lack standing to bring this action. But Plaintiffs' opening summary judgment brief and standing declarations make clear[1] that CESAR has associational standing, through Dr. Zink,

---

[1] The Service's contention that Plaintiffs have "waived" standing is without merit. Plaintiffs appropriately adduced their arguments for and evidence of standing in conjunction with their summary judgment motion. *See* Pltfs' MSJ Mem. 2 n.2, 17-19; Zink Decl.; Sagouspe Decl. Even if Plaintiffs had not done so, the Service would not have been prejudiced thereby, given that the briefing schedule affords the agency the opportunity to respond to both of Plaintiffs' merits briefs.

2

to litigate the case.[2] A party has associational standing if at least one of its members has standing to sue in his own right, the member's interest is germane to the party's mission, and the member's direct participation in the action is unnecessary. *Sierra Club v. FERC*, 827 F.3d 59, 67 (D.C. Cir. 2016). The Service and Intervenors focus their attack on the first element of this test—namely, Dr. Zink's standing as a member of CESAR.[3] An individual has standing to sue in his own right if he has suffered a concrete and particularized injury-in-fact that is fairly traceable to the challenged action and that is likely to be redressed by favorable judicial decision. *WildEarth Guardians v. Jewell*, 738 F.3d 298, 305 (D.C. Cir. 2013).

The Service and Intervenors argue that the agency's denial of Plaintiffs' delisting petition does not injure Dr. Zink. But the agency's denial of the petition (which itself is principally based on the work of the Zink-Barrowclough research team) directly injures Dr. Zink's professional interests in gnatcatcher taxonomy

---

[2] Because CESAR has associational standing to sue, the Court may address the claims advanced in this action without determining whether any other Plaintiff has standing. *In re Navy Chaplaincy*, 697 F.3d 1171, 1178 (D.C. Cir. 2012).

[3] CESAR does not have formal "members" for purposes of the California Corporations Code. *Cf.* Cal. Corp. Code § 5056(a) (defining "Member"). But CESAR does maintain an active list of informal members—including Dr. Zink—who join through the organization's website. Sagouspe Decl. ¶ 4. *Cf.* Cal. Corp. Code § 332(a) ("A corporation may refer to persons associated with it as 'members' even though such persons are not members within the meaning of Section 5056 . . . .").

3

as well as avian systematics generally. *See* Pltfs' MSJ Mem. 17-19. After all, it expressly rejects the Zink-Barrowclough team's 2013 nuclear DNA study, which explicitly argues that the gnatcatcher should not be considered a separate subspecies. AR002810-12. Indeed, the petition denial goes further, to reject the Zink-Barrowclough team's standard of genetic diagnosability (demonstratable through, for example, reciprocal monophyly) to identify avian subspecies. AR002810. The petition denial therefore brings to naught the substantial outlay of time, effort, and research funding that Dr. Zink and his colleagues have expended to assess the gnatcatcher's taxonomy, beginning with the Zink-Barrowclough team's 2000 mitochondrial DNA study, AR025341-52, continuing through to its 2013 nuclear DNA study, AR025356-65, and its 2016 published response to the 2013 study's critics, AR025367-76. *See* Zink Decl. ¶ 2 ("One of my main study species has been the so-called coastal California gnatcatcher (*Polioptila californica californica*).").

The petition denial also injures Dr. Zink's longstanding efforts to bring more objectivity and intellectual rigor to avian taxonomy generally. *See*, *e.g.*, AR025265-68 (Robert M. Zink, *The role of subspecies in obscuring avian biological diversity and misleading conservation policy*, 271 Proc. R. Soc. Lond. 561 (2004)); Zink Decl. ¶ 8 (discussing his 2015 Southwestern willow flycatcher study, AR025270-80); AR025308 (Zink 2015 comment letter) ("[T]here are better ways to both aid

4

the preservation of [gnatcatcher] habitat and retain scientific credibility than by recourse to shoddy taxonomy and selective or biased manipulation of data.").

These professional injuries, which are the immediate result of the Service's petition denial, have affected Dr. Zink "in a personal and individual way," not shared by the public at large. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). *See Animal Welfare Inst. v. Kreps*, 561 F.2d 1002, 1007 (D.C. Cir. 1977) (an association's injury-in-fact may be satisfied by allegations of harm to the "scientific . . . interests of [its] members"). Article III's injury-in-fact and "fairly traceable" requirements demand no more.

Nothing in *Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992), is to the contrary. There the Supreme Court held that an academic interest in a species is insufficient to establish standing to challenge a regulation that would limit the obligation of federal agencies to review and moderate their programs' impacts to protected species and their habitat, just to those agency activities occurring within the United States or on the high seas. *Id*. at 558-59. The problem with such a challenge, the Court explained, is that "pure speculation and fantasy," *id*. at 567, would be required to tie any species' injury resulting from an unreviewed federal activity occurring in a foreign nation to the plaintiff possessing the "vocational" interest in the affected species. *See id*. at 566-67 (rejecting standing, based on a professional interest in a species, to challenge "a single project affecting some

5

portion of that species with which [the plaintiff] has no more specific connection"). But no such speculation need be indulged here to sustain Dr. Zink's standing. For in this case, the Service's petition denial—regardless of its impact to the gnatcatcher—*directly* injures Dr. Zink's (as well as the Zink-Barrowclough team's) professional interests by, as stated above, rejecting both the recommendations of his gnatcatcher-specific work as well as his research in avian systematics generally. *See*, *e.g.*, AR002810 (rejecting reciprocal monophyly). Moreover, the Service's actions—particularly its reliance on the Science Workshop Panel and its refusal to allow Dr. Zink an opportunity to participate therein—directly injure Dr. Zink's professional reputation by impugning his competence and ethics.[4] *See*, *e.g.*, AR017474 (Science Workshop Panelist Memo #1) (contending that Dr. Zink's viewpoint on subspecies "is a minority and fringe one" which "taints the way he views and analyzes the data," and questioning "the ethics of the funding source[s]" because they purportedly have "found a scientist who fits their world view and [they] exploit that scientist"). *Cf. Foretich v. United*

---

[4] Ironically, Intervenors' briefing exacerbates that injury by repeating the charge of Dr. Zink's critics that the Zink-Barrowclough team's studies have been compromised by their funding source. Int. MSJ Mem. 20-21. Notably, Intervenors do not discuss the team's published response to its critics' claim of conflicts of interest, AR025372-73 (Zink *et al.* 2016).

6

*States*, 351 F.3d 1198, 1214 (D.C. Cir. 2003) (reputational injury can be suffice for standing).

For their part, Intervenors call upon the principle that "a special professional interest" that boils down to a desire that a law "as written be obeyed" is insufficient to confer standing. *Diamond v. Charles*, 476 U.S. 54, 66 (1986). But a professional interest *is* sufficient if it can distinguish "a person with a direct stake in the outcome of a litigation . . . from a person with a mere interest in the problem." *United States v. SCRAP*, 412 U.S. 669, 689 n.14 (1973). Here, Dr. Zink's interests go well beyond a mere "good government" concern which the Supreme Court has held to be inadequate. As explained above, the Service's petition denial directly injures Dr. Zink's professional interests in avian taxonomy by concluding that the gnatcatcher is a subspecies, and specifically rejecting the Zink-Barrowclough team's studies to the contrary. Thus, unlike cases where a party objects to the reasoning but not to the outcome of agency decision-making,[5] here Plaintiffs through Dr. Zink object both to the outcome of the administrative process—the petition denial—as well as the reasoning purportedly supporting

---

[5] *See Telecomms. Research & Action Ctr. v. FCC*, 917 F.2d 585, 587 (D.C. Cir. 1990) (no standing because the challenger "agreed with the result that was ultimately reached by the FCC"); *New England Power Generators Ass'n v. FERC*, 707 F.3d 364, 369 (D.C. Cir. 2013) (no standing because the challenger's "desired outcome . . . has already been achieved"), *cited in* Int. MSJ Mem. 30.

Pls.' Reply in Support of Mot. for Summ. J.
& Opp. to Cross-Mots. for Summ. J.

that outcome.

Dr. Zink's injuries would also be redressed by a favorable decision from this Court. A remand to the Service requiring the agency to reconsider the petition denial using clear, consistent, and rational standards of taxonomic diagnosis would help Dr. Zink in two ways. First and most naturally, the Service could adopt the Zink-Barrowclough team's standard of genetic diagnosability to identify subspecies, thereby directly vindicating Dr. Zink's professional taxonomic work. Second, even if the Service were to adopt another standard, the mere fact that the standard would be clear, consistent, and rational would help Dr. Zink and his colleagues. For, in that instance, the Zink-Barrowclough team would no longer need to guess as to what its studies must show to convince the Service that pre-modern taxonomic designations should be abandoned. Zink Decl. ¶ 8. *See* AR025298 (Zink comment letter) (explaining that the Zink-Barrowclough team's 2013 nuclear DNA study was the result of the Service's 2011 rejection of the team's mitochondrial DNA study and the agency's suggestion that a nuclear DNA study would be appropriate, which study the Service then ignored).

Similarly helpful would be a remand directing the Service to reconvene the Science Workshop Panel to open it to public participation.[6] That would give Dr.

---

[6] The Service's standing arguments with respect to Plaintiffs' FACA claim are largely misplaced because they proceed on the erroneous premise that the claim

Pls.' Reply in Support of Mot. for Summ. J.
& Opp. to Cross-Mots. for Summ. J.

Zink the opportunity to present his rebuttal arguments concerning McCormack & Maley (2015) directly to the panel, an opportunity that the Service's FACA violations—convening an advisory committee meeting in private with no public notice—made impossible.[7] Zink Decl. ¶ 7. To be sure, the Service's compliance with FACA's procedural mandates would not guarantee a different disposition of the delisting petition. But the Service's contention that *no* change in outcome is possible because the agency already reviewed all of Dr. Zink's submissions is implausible. For if the Service really were competent to assess on its own the gnatcatcher taxonomy studies pro and con, it would have had no reason to convene the workshop in the first place. *Cf.* AR002807 (explaining that the panel was convened in light of "the diverse and conflicting information" concerning the gnatcatcher's taxonomy). It is therefore eminently possible that, if the

---

challenges the workshop proceeding itself. Rather, the claim challenges *the petition denial* as having been principally justified, and vitiated, by reliance on a FACA-violating committee report, Compl. ¶ 62; Pltfs' MSJ Mem. 40-42, a distinction which even Intervenors acknowledge, Int. MSJ Mem. 30 n.11. Thus, the injury-in-fact and "fairly traceable" standing analyses for Plaintiffs' FACA claim largely track those for their Endangered Species Act and Administrative Procedure Act claims.

[7] That the rebuttal was not published until after the panel had completed its secret work, Defs' MSJ Mem. 23, is irrelevant. If the Zink-Barrowclough team had known about the panel's convening, it could have requested expedited publication, or it could have asked the panel to delay its consideration. And, in any event, Dr. Zink certainly could have presented his team's rebuttal arguments to the panel in pre-publication form.

9

workshop panelists were to change their views on the Zink-Barrowclough team's prior work as a result of the team's published rebuttal, so too would the Service. Plaintiffs need show nothing more. *See WildEarth Guardians*, 738 F.3d at 306 (to establish standing for a procedural injury, a party need show only that "the procedural step was connected to the substantive result," not that "the agency would have reached a different substantive result" otherwise).

The remaining elements of associational standing are easily satisfied. A victory in this action resulting in the Service's articulation of a clear, consistent, and rational standard to diagnose (or to disprove) the gnatcatcher subspecies—a standard presumably to be facilitated by the Service's compliance with FACA— would directly further CESAR's mission to reform the Service's unhappy practice of defective taxonomic decision-making. Sagouspe Decl. ¶¶ 2-3, 10. And because Plaintiffs' claims are based on an administrative record and seek equitable relief only, their resolution would not require the "individualized proof" that otherwise might compel the participation of Plaintiffs' members. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 344 (1977).

## II.    The Service's failure to articulate a standard or definition for what constitutes—or does not constitute—a subspecies is arbitrary and capricious

The Service and Intervenors defend the agency's failure to articulate a standard for subspecies diagnosis on two grounds. First, the Service is required

10

to use only the best data available, 16 U.S.C. § 1533(b)(1)(A), which the agency alleges that it has done. And second, an explicit standard-articulation requirement is not found in the Endangered Species Act or the Administrative Procedure Act. Neither argument succeeds.

To begin with, the Service and Intervenors address a straw man with their best-available-data defense. Plaintiffs' argument is not directed to the Service's evidentiary choices, but rather to the rule or standard (or lack thereof) which is supposed to operate on the data derived from those choices. This distinction is critical. Whether the Service wishes to use only genetic evidence, or only morphological evidence,[8] or some combination of the two, or other types of evidence, does not answer the essential question: *what must the evidence show*? In Plaintiffs' view, the evidence must show diagnosability demonstrated by, for example, reciprocal monophyly.[9] The Service is entitled to disagree, *provided* that

---

[8] Quoting a comment letter from subspecies enthusiast Dr. McCormack (who himself has never named a subspecies), and reproducing photographs from outside the administrative record, Intervenors contend that the morphological differences between the coastal California gnatcatcher and other gnatcatcher populations are "easily observable to the naked eye." Int. MSJ Mem. 10 & n.7. Not even the Service would go that far. In fact, the agency's 1994 remand decision concedes that the methods of the Atwood study—the only one "to directly measure phenotype (morphology in this case)," AR017482 (Science Workshop Panelist #3 Memo)—"do not show whether individual birds can be placed correctly into these [subspecies] groups." AR024035.

[9] Citing Dr. Zink's critics, Intervenors purport to identify a number of "flaws" in the Zink-Barrowclough team's gnatcatcher studies that render them unreliable.

Pls.' Reply in Support of Mot. for Summ. J.
& Opp. to Cross-Mots. for Summ. J.

the Service explain (which it has not) what standard or definition it *is* using in place of effective diagnosing standards like reciprocal monophyly.

Put another way, if one were to ask, "what is the definition of negligence?", the answer would not be "hearsay," even though the evidentiary rules of hearsay undoubtedly affect whether a negligence tort can be proved. In the same way it misses the point to say, in response to the question, "what is the definition of subspecies generally, or at least as applied to the gnatcatcher?", that "the best available data have been used." For that reason, the Service's reliance on case law

---

Int. MSJ Mem. 17-20, 31-33. This critique begs the question, because the cited "flaws" are only shortcomings *if one adopts a different definition of subspecies.* In other words, although Dr. Zink's research does not fit well with a very lax definition of subspecies, it is certainly adequate to test for reciprocal monophyly, a point that even the Science Workshop Panelists acknowledged. *See* AR017477 (Science Workshop Panelist #2 Memo) ("The analyses by Zink et al. strongly suggest that the coastal California Gnatcatcher subspecies . . . is not a phylogenetically distinct lineage [and thus], under the restrictive 'subspecies are phylogenetically distinct lineages' definition their conclusion that CCG are not a subspecies is supported."). *See also* AR017514 (Science Workshop Panelist #6 Memo). Moreover, Intervenors' contention that "Dr. Zink's approach to subspecies . . . leaves no room for subspecies' existence," Int. MSJ Mem. 19, is incorrect. *See* AR023542 (Phillimore & Owens 2006) ("Across all biogeographic realms, and including both continental and island-dwelling taxa, a total of 94 (36%) of these [avian] subspecies exhibited monophyly."); Hernan Vazquez-Miranda, *et al.*, *Morphological and molecular evolution and their consequences for conservation and taxonomy in the Le Conte's Thrasher (Toxostoma lecontei)*, 48 J. Avian Bio. 1 (2017) (demonstrating that two subspecies of Le Conte's thrasher are diagnosable and reciprocally monophyletic). Dr. Zink was a member of the Vazquez-Miranda team.

that gives the agency the edge in making evidentiary calls is misplaced.[10] Indeed, if anything that case law supports Plaintiffs' position, because it presupposes that the Service (or the statute itself) has articulated the relevant standard or definition. *See, e.g., Ctr. for Biological Diversity v. Badgley*, 335 F.3d 1097 (9th Cir. 2003) (upholding a determination that the goshawk is endangered or threatened, which are statutorily defined terms, 16 U.S.C. § 1532(6), (20)); *American Wildlands v. Kempthorne*, 530 F.3d 991 (D.C. Cir. 2008) (upholding a determination that the westslope cutthroat trout is not threatened); *Colo. River Cutthroat Trout v. Salazar*, 898 F. Supp. 2d 191 (D.D.C. 2012) (upholding a determination that the Colorado River cutthroat trout is not endangered or threatened).

The Service's second argument, joined by Intervenors, is that Plaintiffs are impermissibly foisting additional procedures onto the agency's decision-making. Not so. The requirement that the Service say what the agency itself means by "subspecies," when it determines that the gnatcatcher is a subspecies, comes not from Plaintiffs but from logic. For the agency cannot competently conclude that

---

[10] Intervenors make a like error in citing the Eleventh Circuit's decision upholding the Service's designation of the Alabama sturgeon as a separate species. *Ala.-Tombigbee Rivers Coal. v. Kempthorne*, 477 F.3d 1250 (11th Cir. 2007). In that case, the challengers attacked the Service's taxonomic determination on the ground that "the Service failed to rely on the best scientific data available," *id*. at 1254, *not* as here that the Service has failed to articulate the rule or standard to govern a taxonomic designation.

13

the gnatcatcher is a subspecies unless it knows and can articulate the necessary elements that comprise a subspecies. *See* George Hayward Joyce, S.J., *Principles of Logic* 123 (3d ed. 1956) (explaining that, in logic, a "species" as the predicate of a subject—*e.g.*, Bucephalus is a horse—is "the sum of the essential attributes of an entity").

The Service and Intervenors object that requiring the agency to state what it means by "subspecies" would hamstring the agency's decision-making by preventing case-by-case determinations. Nothing in Plaintiffs' argument would preclude the Service from developing its taxonomic rules through individual listing determinations, so long as the resulting standards were applied consistently and any variation in application were justified by legitimate scientific principle. But, whether the adjudicatory-like process of producing such a standard is gradual or sudden, the agency must still articulate the standard. It has not done so here. That failure distinguishes this case from one in which the Service, while acknowledging that standards may evolve depending on the species at issue, *has* articulated a standard or definition. *See In re Polar Bear ESA Listing & Sec. 4(d) Rule Litig.*, 709 F.3d 1, 14-15 (D.C. Cir. 2013) (upholding the Service's interpretation of "likely" to mean "the word's ordinary definition" and the agency's interpretation of "foreseeable" to mean "a 45-year period").

The Service also misperceives Plaintiffs' critique of the agency's standard-

dodging. It disclaims any intent to create an arbitrary number of overlapping gnatcatcher subspecies. That is no doubt encouraging to the regulated public, but the disclaimer does not remedy the defect in the Service's analysis. For, although the Service says that its subspecies determination is supported by "difference" or "slight . . . variation," Defs' MSJ Mem. 25, this is simply a pseudo-standard, because its application would produce overlapping and conflicting subspecies, the differentiation among which would be a purely arbitrary exercise.[11] Pltfs' MSJ Mem. 28-29.

Finally, the agency downplays Plaintiffs' concerns about capricious enforcement of the law, noting that only protected gnatcatchers are found in this country. But given that the Endangered Species Act establishes a single listing unit applicable to all wildlife, *see* 16 U.S.C. § 1532(16), that which would justify the gnatcatcher's subspecies designation presumably would justify other listed (and controversial) subspecies, *e.g.*, the Southwestern willow flycatcher, whose cousin subspecies *are* found in this country. *See* AR025272.

---

[11]   Intervenors make a similar mistake. They contend that "all relevant factors point to" the gnatcatcher's being a subspecies. Int. MSJ Mem. 37. But they do not even acknowledge, much less contend with, Plaintiffs' point that merely identifying "morphological and habitat differences" along with "slight genetic variation," *id*. at 36, cannot justify the gnatcatcher's subspecies status, because such "differences" can be found between nearly any randomly divided populations within a species. Pltfs' MSJ Mem. 25-26.

Pls.' Reply in Support of Mot. for Summ. J.
& Opp. to Cross-Mots. for Summ. J.

III.   **The Service's reliance on the Science Workshop Panel violated the Federal Advisory Committee Act and thereby vitiated the delisting petition denial**

   A.   **The Service established or utilized the Science Workshop Panel as an advisory committee under FACA**

The Service and Intervenors contend that the agency did not establish or utilize the Science Workshop Panel within the meaning of FACA. The Service and Intervenors rely on D.C. Circuit case law—principally *Byrd v. EPA*, 174 F.3d 239 (D.C. Cir. 1999), and *Food Chemical News v. Young*, 900 F.2d 328 (D.C. Cir. 1990)— that countenances the skirting of FACA's requirements through an agency's indirect establishment of an advisory committee. But these citations cannot change two critical points. First, the Supreme Court has made clear that FACA's trigger of "established or utilized" is intended to reach "advisory committees established by the Federal Government *in a generous sense of that term*, encompassing groups formed indirectly by quasi-public organizations . . . 'for' public agencies as well as 'by' such agencies themselves." *Public Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 462 (1989) (emphasis added). In other words, an excessively narrow construction of FACA—like that which the Service and Intervenors advance—would be inconsistent with Congressional intent. Second, even the majority in *Byrd* recognized that the establishment of an advisory committee through an independent contractor would not always absolve an agency from compliance with FACA. *Byrd*, 174 F.3d at 247 (noting that the result might have

16

been different had EPA exercised greater control over the outside contractor). In fact, the degree of influence and control that the Service exerted over the Science Workshop Panel distinguishes this case from *Byrd* and *Food Chemical*.

The Service and Intervenors argue to the contrary, drawing a number of parallels principally between the EPA's actions in *Byrd* and the Service's actions here. But the parallels are not complete. Here the panel met privately in the agency's own building without any prior public notice, AR017376; in *Byrd*, the agency panel met in a hotel conference room and the public, including the challenger in *Byrd*, had the opportunity to testify. *Byrd*, 174 F.3d at 241-42. Here the panel changed course after consultation with agency officials, AR017381, whereas no comparable influence occurred during the panel deliberations in *Byrd*, 174 F.3d at 242. Here the outside contractor's final work product was subject to agency review and editing, AR013036-37, AR013244-63, AR013564-84, whereas *Byrd* is silent as to any subsequent agency influence. *See Byrd*, 174 F.3d at 242. And here the agency originally planned to proceed with a public science workshop, AR011598, much like what did occur in *Byrd*, but then suddenly and inexplicably jettisoned the idea, suggesting a desire to thwart FACA's public-participation purpose.

Similarly distinguishable is *Food Chemical*, which the Service and Intervenors also call upon. There the putative advisory committee meeting was

17

at least partially open to the public. *Food Chem*., 900 F.2d at 330. Also the contractor, not the agency, "set the panel's agenda, scheduled its meetings, and would have reviewed the panel's work." *Id*. at 333. In contrast, here the Service kept the panel's deliberations secret, while setting the agenda, writing the panel's charter, formulating the panel's key questions, revising the contractor's initial proposal, providing the panel with its library of materials, and directly influencing the panel's work. Pltfs' MSJ Mem. 34-35.

Perhaps none of the distinctions between this case and *Byrd* and *Food Chemical*, taken individually, would place this case within *Byrd*'s exception; but their cumulative force is sufficient to support the conclusion that the Service exercised such "significant . . . authority," *Byrd*, 174 F.3d at 247, over the panel that it "established or utilized" an advisory committee.

### B.   The Service used the panel's work product as a group contribution

The Service and Intervenors argue that, even if the agency "established or utilized" the Science Workshop Panel under FACA, the panel's deliberations were still exempt from FACA because the panel did not provide advice as a group. True enough, the panel members wrote individual memoranda. But in its petition denial, the Service did not primarily treat the panel members individually; rather, the Service used their points of consensus to bolster the agency's decision. For example, in the section of the Service's petition denial entitled "Key Information

18

From the Science Panel Memoranda," the agency explained that "all six panelists" found that the gnatcatcher is a separate subspecies, and then listed several points to which all of the panelists subscribed, points which not surprisingly were critical of the Zink-Barrowclough team's approach to subspecies diagnosis generally and gnatcatcher genetic research in particular. AR002807-08. Similarly, the Service cited the panelists' unified critique of reciprocal monophyly as a reason to reject one of the Zink-Barrowclough team's bases for diagnosing subspecies. *See* AR002810 ("[T]he science panelists explicitly rejected the use of reciprocal monophyly for defining subspecies status for the coastal California gnatcatcher . . . ."). The consensus building was abetted by the Service's contractor, which prepared a memo summarizing the key points of agreement among the panelists. *See* AR017381-82.

This de facto group treatment of the panelists' work distinguishes this case from those cited by the Service. In *American Society of Dermatology v. Shalala*, 962 F. Supp. 141 (D.D.C. 1996), one of the "main factors" leading the court to conclude that the panel at issue in that case was not an advisory committee was "the absence of any attempt to achieve a consensus among the panelists." *Id*. at 148. Similarly, in *Freedom Watch, Inc. v. Obama*, 930 F. Supp. 2d 98 (D.D.C. 2013), the court concluded that the pertinent stakeholder meetings were not advisory committees because their members "were not asked to, and did not, provide

19

advice or recommendations as a group." *Id*. at 102 (citation omitted). In contrast here, the Service *did* use the individual panelists' memoranda as a group product, in particular to identify various consensus points to critique the Zink-Barrowclough team's work and the delisting petition. AR002807-08.

As the D.C. Circuit has instructed, whether a panel is to be understood as providing group rather than aggregated individual input, and thus whether a panel qualifies as an "advisory committee," depends, "in large measure, [on whether it has] an organized structure, a fixed membership, and a specific purpose." *Ass'n of Am. Physicians & Surgeons, Inc. v. Clinton*, 997 F.2d 898, 914 (D.C. Cir. 1993). Those groups that "have been created ('established') with a good deal of formality" are more likely to be considered advisory committees than those groups with looser structures. *Id*. In other words, formality of structure determines the "group advice vs. individual advice" issue. And here, given that the Science Workshop Panel's charter, scope of work, agenda, materials, membership, and term of existence were all precisely determined by the Service, the panel handily satisfies FACA's group structure requirement.

## C.  Plaintiffs did not sit on their rights

The Service contends that, even if it violated FACA, Plaintiffs should be denied a remedy because they failed to help themselves by suing the Service before it rejected the delisting petition. The Service is correct that Plaintiffs'

counsel became aware of the Science Workshop Panel's convening prior to the petition denial. But the Service does not mention that the agency *refused* to provide any more information about the nature of the panel. AR024732 (Plaintiffs' counsel's Congressional testimony explaining that, in response to counsel's FOIA request, the Service withheld among other things all panelist and contractor reports, as well as panelist identities and agency responses to contractor questions). Thus, until the petition denial was finalized, Plaintiffs had no way to know what the panel discussed, its opinion of the Zink-Barrowclough team's work, or any other matter. Hence, Plaintiffs had no way to know whether in fact they were injured by the Service's FACA violation.

The Service cites no authority for the proposition that a person aware of a FACA violation must bring suit to remedy that violation before he is aware that he has been injured by the violation. *Cf. Spokeo*, 136 S. Ct. at 1550 ("A violation of . . . procedural requirements may result in no harm."). In fact, in nearly every case that the Service cites, the FACA plaintiffs were aware of the FACA violation *as well as its prejudice* prior to the agency's having acted. *See Cal. Forestry Ass'n v. U.S. Forest Serv.*, 102 F.3d 609, 614 (D.C. Cir. 1996) (noting that at least some advisory committee meetings had been open to the public, and that the panel had "made other efforts to keep the public informed," including the plaintiff); *Natural Resources Defense Council v. Pena*, 147 F.3d 1012, 1015 (D.C. Cir. 1998) (noting that the

agency "apprised the public of the Committee's membership, agendas, open meetings and mission statement," and that three of the four plaintiffs had been allowed to present their views to the committee); *Idaho Farm Bureau Fed'n v. Babbitt*, 900 F. Supp. 1349, 1366 (D. Idaho 1995) (noting that the plaintiffs through their consultant "participated extensively in the public hearings, the panel meeting, and by submitting written comments"). The remaining case the Service calls upon, *Western Watersheds Project v. United States Forest Service*, Nos. CV-07-151, CV-07-241, 2009 WL 3199120 (D. Idaho Sept. 26, 2009), is not clear on what the challenger knew or when. *See id*. at *1-*3. But the decision is not persuasive in any event because it concludes that agency action reliant on a FACA-violating committee report is necessarily immune from judicial review. *Id*. at *3. The better reading of the case law is to the contrary. *See* Plfts' MSJ Mem. 40-42. *Cf. Ala.-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1107 (11th Cir. 1994) ("[T]o allow the government to use the product of a tainted procedure would circumvent the very policy that serves as the foundation of the Act.").

### D.   The Service's FACA violations were not harmless

The Service contends that it is substantially likely that the agency would have reached the same result—*i.e.*, denial of the delisting petition—even if it had fully complied with FACA. But that conclusion is self-serving and without foundation. Had the panel discussions been open to the public, Dr. Zink could

have presented his rebuttal to the critiques lodged against the Zink-Barrowclough team's work. Moreover, the panel could have been asked to suggest a clear, consistent, and rational standard for subspecies designation for the Service to apply to the gnatcatcher. The Service dismisses these possibilities, citing that all of the panelists rejected the Zink-Barrowclough team's 2013 study. But what the Service does not mention is that the team's 2016 rebuttal, AR025367-76, was largely directed to the published critique of McCormack and Maley (2015), and that the latter's (as far as the panel was aware) unanswered critique of the team's 2013 study significantly influenced the panelists. *See*, *e.g.*, AR017473 (Science Workshop Panelist #1 Memo) ("McCormack and Maley (2015) provide an excellent overview of the flaws in logic and analysis of Zink et al. (2013)."); AR017475 (Science Workshop Panelist #2 Memo) ("I agree with McCormack and Maley (2015) . . . ."); AR017484 (Science Workshop Panelist #3 Memo) ("I also agree with McCormack and Maley (2015) that Zink et al. do not directly test the subspecies hypothesis . . . ."). Further, the Service's peremptory harmless-error analysis overlooks that one of the Zink-Barrowclough team's key critiques of using subtle or slight "differences" to draw subspecies boundaries—which differences were the basis for the panelists' affirmation of the gnatcatcher's subspecies status, *see* Pltfs' MSJ Mem. 25-26—is that then "membership is possible in multiple, overlapping, and nonhierarchical groups," AR025373, a point that the panel failed

23

to address.

The Service also argues that it had bases to affirm the gnatcatcher's subspecies status besides the panel report. But that claim is belied by the petition denial itself, which cites the panel report over two dozen times, AR002807-13, whereas no other cited source even comes close to that level of attention. It is also belied by the Service's stated reason for convening the panel—namely, to help the agency digest the arcane and conflicting body of scientific material on the gnatcatcher's taxonomy. AR002807. How then can it be that the Service needed the help of the science panel to understand the debate between the Zink-Barrowclough team and other taxonomists, but only to a point, and then the Service could go it alone? Finally, because FACA is a procedural statute, to credit an agency's statement of "we would reach the same result anyway" when the agency has substantially violated the mandated procedures—no notice, no public participation, indeed no information about the panel at all until after the petition denial—would render the statute a nullity. *See Oglala Sioux Tribe v. U.S. Nuclear Reg. Comm'n*, No. 17-1059, 2018 WL 3490073, at *11 (D.C. Cir. July 20, 2018) ("significant" procedural deficiencies are not harmless).

The Service's authority is to no avail. In *American Petroleum Institute v. Costle*, 665 F.2d 1176 (D.C. Cir. 1981), the agency action ultimately taken "constitute[d] a rejection of the [FACA-violating] panel's conclusion." *Id.* at 1190. Here, however,

the Service's petition denial is effectively an endorsement of the Science Workshop Panel's conclusions. Similarly, in *Northwest Forest Resource Council v. Espy*, 846 F. Supp. 1009 (D.D.C. 1994), the plaintiff had not been harmed by the alleged FACA-violating report because the Forest Plan for which it had been produced had not yet been implemented. *Id.* at 1015. Here, however, Plaintiffs and their members (including Dr. Zink) have already been harmed by the Service's reliance on the Science Workshop Panel's report in denying the petition to delist the gnatcatcher. That injury, combined with the evidence that Dr. Zink would adduce on remand, make the Service's FACA violations far from harmless.

## CONCLUSION

The Plaintiffs' motion for summary judgment should be granted, and the cross-motions denied.

DATED: August 27, 2018.

Respectfully submitted,
s/ Damien M. Schiff
DAMIEN M. SCHIFF*
Cal. Bar No. 235101
Email: dms@pacificlegal.org
ANTHONY L. FRANÇOIS*
Cal. Bar No. 184100
Email: alf@pacificlegal.org
Pacific Legal Foundation
930 G Street
Sacramento, California 95814
Telephone: (916) 419-7111
Facsimile: (916) 419-7747

JONATHAN WOOD
D.C. Bar No. 1045015
Email: jw@pacificlegal.org
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 610
Arlington, Virginia 22201
Telephone: (202) 888-6881

*Pro Hac Vice*

*Attorneys for Plaintiffs*

25

& Opp. to Cross-Mots. for Summ. J.

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2018, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the District of Columbia by using the CM/ECF system, which will serve a copy of the same on the counsel of record.


s/ Damien M. Schiff
DAMIEN M. SCHIFF

Pls.' Reply in Support of Mot. for Summ. J.
& Opp. to Cross-Mots. for Summ. J.