UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CENTER FOR ENVIRONMENTAL SCIENCE, ACCURACY & RELIABILITY, et al.,<br><br>    Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF INTERIOR, et al.,<br><br>    Defendants. | Civil Action No. 17-2313 (JDB) |

## MEMORANDUM OPINION

Plaintiffs—a coalition of advocacy groups focused on science, property rights, and home builders—challenge the denial of their petition to remove the coastal California gnatcatcher from the threatened species list. They bring this lawsuit against the United States Department of Interior and its agency, the Fish and Wildlife Service ("FWS") (collectively, the "federal defendants"), alleging violations of the Endangered Species Act (the "ESA"), 16 U.S.C. § 1533(b)(3)(B); the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A); and the Federal Advisory Committee Act ("FACA"), 5 U.S.C. App. 2, § 10(a)(1)-(3). But before the Court may consider the merits of their claims, plaintiffs must establish that they have standing to bring them. They have failed to do so. Hence, for the reasons explained below, the Court will deny plaintiffs' motion for summary judgment and grant federal defendants' and defendant-intervenors' cross-motions for summary judgment.

1

## BACKGROUND

I. **Statutory Background**

The ESA creates a statutory framework for the conservation of "endangered species and threatened species" and the ecosystems on which they depend. 16 U.S.C. § 1531(b). FWS, which has been delegated authority by the Secretary of the Interior to administer the ESA, is responsible for determining whether a species is "endangered" or "threatened," and hence whether it is protected by statute. Am. Wildlands v. Kempthorne, 530 F.3d 991, 994 (D.C. Cir. 2008) (citing 50 C.F.R. § 402.01(b)). In considering whether to list a species as threatened or endangered, FWS must determine whether the species satisfies one of five statutorily-provided factors and make its finding "solely on the basis of the best scientific and commercial data available . . . after conducting a review of the status of the species and after taking into account those efforts . . . to protect such species." 16 U.S.C. § 1533(a)(1), (b)(1)(A).

Of course, before an animal population may be listed as protected by the ESA, it must first qualify as a "species" under the statute. See Am. Wildlands, 530 F.3d at 994. Although the ESA defines "species" as broadly encompassing "subspecies," it does not specify what either term means. 16 U.S.C. § 1532(16). Instead, FWS is instructed to "rely on standard taxonomic distinctions and the biological expertise of the Department [of the Interior] and the scientific community concerning the relevant taxonomic group" to determine whether an animal population is a species (or subspecies) for purposes of the ESA. 50 C.F.R. § 424.11(a). The question whether FWS must itself articulate a definition of "subspecies" drives plaintiffs' claims.

II. **Factual Background**

In 1993, FWS determined that the coastal California gnatcatcher—a small songbird found as far south as 30 degrees north latitude in Baja California—was a threatened subspecies under the

ESA. AR 24007.[1]  The bird's designation as a distinct subspecies was critical to its listing.  While FWS determined that there were only a few thousand coastal California gnatcatcher breeding pairs, gnatcatchers were plentiful at the species level.  AR 24007; see Endangered Species Comm. of Bldg. Indus. Ass'n of S. Cal. v. Babbitt, 852 F. Supp. 32, 34 (D.D.C. 1994) (noting that if the costal California gnatcatcher subspecies was found to include gnatcatchers dwelling five degrees further south, "then the bird likely existed in large enough numbers to stay off of the threatened list").

In 2014, several of the plaintiffs in this action submitted a petition to delist the coastal California gnatcatcher.  AR 1–40.  The petition was primarily based on a 2013 nuclear DNA study by Dr. Robert Zink that concluded that "no evolutionarily significant divisions exist within the [gnatcatcher] species."  AR 47.  Contending that this study constituted "the best available scientific data" on the gnatcatcher's taxonomy, the petition claimed that the coastal California gnatcatcher was not a valid subspecies eligible for protection under the ESA.  AR 15–16; 35–39.

FWS initiated a review of the petition.  AR 323.  As part of this process, it hired an independent contractor to convene a scientific review panel to consider the bird's subspecies status.  AR 2807.  The panelists unanimously rejected the 2013 Zink study, finding that the study's approach was unlikely to reveal whether the coastal California gnatcatcher was in fact a distinct subspecies.  AR 2810–12.  Relying in part on the panelists' conclusions, FWS denied the delisting petition in 2016.  AR 2813.

A year later, plaintiffs filed the instant lawsuit.  They argue that FWS was required to select a definition of "subspecies" to apply before it could determine that the coastal California gnatcatcher qualified as one.  Mem. of P. & A. in Supp. of Pls.' Mot. for Summ. J. ("Pls.' Mot.")

---

[1] Citations to "AR" refer to the administrative record.  See Joint Appendix [ECF Nos. 35–38].

3

[ECF No. 24] at 20–32. Because FWS's listing decision was not based on an articulated standard, plaintiffs contend that the denial of the petition was arbitrary and capricious in violation of the ESA and APA. Id. Plaintiffs also argue that the scientific panel that reviewed the bird's subspecies status qualified as an "advisory group" under FACA, triggering a number of procedural requirements that FWS allegedly failed to meet. Id. at 33–42.

The parties have now filed cross-motions for summary judgment, which are ripe for consideration.

## DISCUSSION

In considering the parties' motions, the Court begins, as it must, with the issue of standing. "Standing is an element of this Court's subject-matter jurisdiction under Article III of the Constitution, and requires, in essence, that a plaintiff have 'a personal stake in the outcome of the controversy.'" Elec. Privacy Info. Ctr. v. Pres. Advisory Comm'n on Election Integrity, 266 F. Supp. 3d 297, 306 (D.D.C. 2017) (quoting Warth v. Seldin, 422 U.S. 490, 498 (1975)). To establish that it has standing under Article III, a plaintiff must show (1) that it has suffered an "injury in fact" that is both "concrete and particularized" and "actual or imminent;" (2) that the injury is "fairly traceable" to the defendant's challenged action; and (3) that it is likely "that injury will be 'redressed by a favorable decision.'" Lujan v. Defs. of Wildlife, 504 U.S. 555, 560–61 (1992) (citations and alterations omitted). These elements "are not mere pleading requirements but rather an indispensable part of the plaintiff's case." Id. at 561. At least one plaintiff must demonstrate that it has standing as to each claim asserted. See Mountain States Legal Found. v. Glickman, 92 F.3d 1228, 1232 (D.C. Cir. 1996).

When the plaintiff is an organization, it may assert standing either on its own behalf as an institution, or on behalf of its members. People for the Ethical Treatment of Animals v. U.S. Dep't

4

of Agric., 797 F.3d 1087, 1093 (D.C. Cir. 2015). The latter, which is known as associational standing, requires the plaintiff to show that "(1) at least one of its members would have standing to sue in his own right, (2) the interests the association seeks to protect are germane to its purpose, and (3) neither the claim asserted nor the relief requested requires that an individual member of the association participate in the lawsuit." Sierra Club v. EPA, 292 F.3d 895, 898 (D.C. Cir. 2002) (citing Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333, 342–43 (1977)).

Whether bringing claims on its own behalf or on behalf of others, the plaintiff bears the burden of demonstrating it has standing. Each standing element "must be supported . . . with the manner and degree of evidence required at the successive stages of the litigation." Defs. of Wildlife, 504 U.S. at 561–62. While "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice," at summary judgment a plaintiff "can no longer rest on 'mere allegations.'" Id. (citation omitted) Instead, it "must 'set forth' by affidavit or other evidence 'specific facts,' . . . which, for purposes of the summary judgment motion will be taken to be true." Id. at 561 (citation omitted). Failure to do so is fatal to a plaintiff's case. The district court "will not 'presume the missing facts' necessary to establish an element of standing." Swanson Grp. Mfg. LLC v. Jewell, 790 F.3d 235, 240 (D.C. Cir. 2015) (quoting Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 889 (1990)).

Here, only one plaintiff, Center for Environmental Science, Accuracy, and Reliability ("CESAR"), has submitted any evidence to support its standing.[2] CESAR is a non-profit corporation that "advocates for the use of data and the scientific method to ensure consistent

---

[2] The remaining plaintiffs—Coalition of Labor, Agriculture & Business of Santa Barbara County; Property Owners Association of Riverside County; California Building Industry Association; National Association of Home Builders of the United States; and Building Industry Legal Defense Foundation—have not asserted standing in their briefs, nor have they submitted or identified any evidence demonstrating that they have standing. See Pls.' Mot. at 2 n.2; Pls.' Reply in Supp. of Mot. & in Opp'n to Cross-Mots. for Summ. J. ("Pls.' Reply") [ECF No. 30] at 2–10 & 2 n.1

5

application of environmental statutes." Decl. of Jean Sagouspe in Supp. of Pls.' Mot. ("Sagouspe Decl.") [ECF No. 24-2] ¶ 2. As it concedes, it has no formal members under either its corporate charter or California corporations law. See Pls.' Reply at 3 n.3; Certificate of Amend. to Art. of Incorporation, Ex. 1 to Fed. Defs.' Cross-Mot for Summ. J. [ECF No. 27-1]. It does, however, have "informal members" who join CESAR's mailing list through its website. Pls.' Reply at 3 n.3; Sagouspe Decl. ¶ 4. CESAR asserts that it has associational standing[3] to represent the interests of one of these informal "members"—the 2013 study author, Dr. Robert Zink—and submits declarations from both Dr. Zink and CESAR's chairman of the board, Jean Sagouspe, in support of its claim. See Decl. of Robert M. Zink in Supp. of Pls.' Mot. ("Zink Decl.") [ECF No. 24-1]; Sagouspe Decl.

But CESAR has failed to establish that its "informal members" (including Dr. Zink) are true members at all. "[M]ere assertion that an individual is a 'member' of an organization is not sufficient to establish membership." AARP v. U.S. Equal Emp't Opportunity Comm'n, 226 F. Supp. 3d 7, 16 (D.D.C. 2016). "In determining whether an organization that has no members in the traditional sense may nonetheless assert associational standing, the question is whether the organization is the functional equivalent of a traditional membership organization." Gettman v. Drug Enforcement Admin, 290 F.3d 430, 435 (D.C. Cir. 2002) (citation omitted). Relevant here, the organization must show that it "represent[s] individuals that have all the 'indicia of membership,' including (i) electing the entity's leadership, (ii) serving in the entity, and (iii) financing the entity's activities." Wash. Legal Found. v. Leavitt, 477 F. Supp. 2d 202, 208 (D.D.C. 2007) (citing Fund Democracy LLC v. SEC, 278 F.3d 21, 25 (D.C. Cir. 2002)); see also Hunt, 432 U.S. at 344–45.

---

[3] CESAR does not assert organizational standing. See Pls.' Mot. at 2 n.2; Pls.' Reply at 2–3.

CESAR's "informal members" do not have any indicia of traditional membership. CESAR has not submitted any evidence suggesting that these individuals play any role in electing CESAR's leadership or in directing its activities. And although members (and non-members) may choose to finance the organization through donations, they are not required to do so. See "Become a Member," CESAR, www.bestscience.org/take-action.html (last visited July 3, 2019) (cited in Sagouspe Decl. ¶ 4).

The only asserted tie CESAR's "informal members" have to the organization is that they have joined CESAR's online mailing list. See CESAR, www.bestscience.org (last visited July 3, 2019) (linking to online membership application through "Join Our Mailing List"). By providing their email addresses, individuals receive a free, unlimited "subscription" that allows them "[t]o show [their] support and to stay up to date on the latest news." www.bestscience.org/take-action.html. "But readership is not the same as membership." Gettman, 290 F.3d at 435 (finding magazine could not assert associational standing on behalf of its readers and subscribers); see also Wash. Legal Found., 477 F. Supp. 2d at 210 (individuals on mailing list, without more, were not legal foundation's "members" for purposes of associational standing). In the absence of any evidence that CESAR's online mailing list recipients have all (or any) indicia of traditional membership, the Court finds that CESAR may not assert associational standing on their behalf.

In any case, CESAR has not established that its "member," Dr. Zink, would have standing to bring a claim in his own right. CESAR asserts that Dr. Zink suffered both professional and reputational injuries when FWS rejected his research. See Pls.' Reply at 3–6. But at summary judgment, it is not enough to make conclusory or unsubstantiated allegations of harm. See Defs. of Wildlife, 504 U.S. at 561. CESAR "must either identify in [the administrative] record evidence sufficient to support its standing to seek review or, if there is none because standing was not an

issue before the agency, submit additional evidence" to the Court. Sierra Club, 292 F.3d at 899. CESAR has not done so. Although it proffers the declaration of Dr. Zink, he has himself asserted no injury. He states only that an agency-articulated standard for what constitutes a subspecies "would be of significant help" to him as he plans future research projects on "dubious subspecies." Zink Decl. ¶ 8. This is not the type of "concrete and demonstrable injury" that Article III requires. Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982). FWS's failure to set forth an agency-articulated definition of "subspecies" for purposes of the ESA does not "perceptibly impair" Dr. Zink's ability to study the coastal California gnatcatcher or to conduct scientific research more generally. Food & Water Watch, Inc. v. Vilsack, 808 F.3d 905, 920–21 (D.C. Cir. 2015) (citation omitted) (finding no standing where the agency regulation did not "perceptibly impair[]" the advocacy organization's ability to educate the public). Moreover, Dr. Zink's injury—if it may be construed as such—flows from an "unfulfilled desire" to change the agency's legal rationale rather than from the petition denial itself. Petro Star Inc. v. Fed. Energy Reg. Comm'n, 835 F.3d 97, 110 (D.C. Cir. 2016). It is well-established in this Circuit that "a litigant's interest in an agency's legal reasoning and its potential precedential effect does not by itself confer standing where, as here, it is uncoupled from any injury in fact caused by the substance of the agency's adjudicatory action." Crowley Caribbean Transp., Inc. v. Pena, 37 F.3d 671, 674 (D.C. Cir. 1994) (citation, quotation marks, and alterations omitted); see also Petro Star Inc., 835 F.3d at 110 (finding intervenors lacked standing to challenge the legal standard the agency employed when its injury did not flow from the ultimate agency decision). Hence, Dr. Zink lacks standing, and CESAR's assertion that it represents his interests is to no avail.

## CONCLUSION

"Without jurisdiction the court cannot proceed at all in any cause." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (citation omitted). Courts "do not insist on record evidence and affidavits because we are misguided nitpickers, but rather because we must respect the limits of our jurisdiction." Conservation Force, Inc. v. Jewell, 733 F.3d 1200, 1207 (D.C. Cir. 2013). At this stage of the proceedings, general allegations are not enough. See Sierra Club v. EPA, 925 F.3d 490, 495 (D.C. Cir. 2019). Where, as here, plaintiffs fail to provide evidence that they have standing, the Court's authority to hear the case evaporates. Hence, plaintiffs' motion for summary judgment will be denied and federal defendants' and defendant-intervenors' cross-motions for summary judgment will be granted. A separate order has been issued on this date.

/s/
JOHN D. BATES
United States District Judge

Dated: July 3, 2019